

**The Business Court of Texas,
11th Division**

| | | |
|---|---|---|
| MARATHON OIL CO., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Cause No. 25-BC11A-0013 |
| | § | |
| MERCURIA ENERGY AMERICA, | § | |
| LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |

═══════════════════════════════════════

*Syllabus*[*]

═══════════════════════════════════════

In this force-majeure dispute arising out of a contract for the purchase and sale of natural gas based on the North American Energy Standards Board base-contract form, the parties dispute (a) whether the transaction confirmations are part of their contract and (b) which one controls over the other. The Court holds that, although the seller's transaction confirmation identifies a delivery term on which the buyer's confirmation is silent, the two confirmations do not materially conflict. Thus, both transaction confirmations combine with the base contract to form a single, integrated agreement, and neither confirmation trumps the other.

---

[*] The syllabus was created by court staff and is provided for the convenience of the reader. It is not part of the Court's opinion, does not constitute the Court's official description or statement, and should not be relied upon as legal authority.

FILED IN
BUSINESS COURT OF TEXAS
BEVERLY CRUMLEY, CLERK
ENTERED
9/18/2025



**The Business Court of Texas,
11th Division**

| | | |
|---|---|---|
| MARATHON OIL CO., | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Cause No. 25-BC11A-0013 |
| MERCURIA ENERGY AMERICA, | § | |
| LLC, | § | |
| *Defendant.* | § | |

## OPINION AND ORDER

¶1      Pursuant to the Scheduling Order, the parties filed a Joint Advisory on Early Legal Issues identifying legal issues that one or both parties contend can be resolved early in the case to facilitate efficiency or resolution. The Court requested briefing on two such issues (#3 and #12) and now rules on the first such issue (#3) pursuant to Texas Rule of Civil Procedure 166(g).[1]

---

[1] TEX. R. CIV. P. 166(g); *see also Skeels v. Suder*, 671 S.W.3d 664, 670 (Tex. 2023); *JPMorgan Chase Bank, N.A. v. Orca Assets G.P.*, 546 S.W.3d 648, 653 (Tex. 2018).

## Summary

¶2     This dispute arises out of Marathon's force-majeure declaration under its natural-gas purchase and sale agreement with Mercuria, in the wake of Winter Storm Uri. The question before the Court is whether the transaction confirmations exchanged by the parties are part of their "Contract," as defined in their agreement, and whether either party's confirmation controls over the other's. The Court holds that whether the parties' transaction confirmations are part of the Contract depends on whether they are "binding" under their agreement, which in turn depends on whether the recipient timely (a) notified the sender that the confirmation materially differed from its understanding of the agreement or (b) sent its own confirmation containing materially different terms. The Court holds that there is no material difference between the parties' confirmations, such that both are "binding" and form part of the parties' integrated agreement and neither trumps the other.[2]

## Background

¶3     Marathon Oil Co. and Mercuria Energy America are parties to a Base Contract for Sale and Purchase of Natural Gas (the Base Contract), a master contract that sets out overarching terms and conditions governing their individual

---

[2] The issue of how the pipeline term affects Marathon's obligations under the Contract is not before the Court, and the Court does not reach any conclusion in that regard.

transactions.[3] The parties first agreed to the transaction at issue in January 2021 via ICE Chat, an instant messaging platform used by natural gas traders.[4] The chat specified the transaction's quantity ("20k"), duration (February), price ("IF PEPL plus $.035"), and delivery location ("EOIT West Pool").[5] The following morning, Mercuria sent Marathon a transaction confirmation stating the same terms with some additional terms (such as that it was a "firm" transaction) and details.[6] The morning after that, Marathon sent Mercuria its own transaction confirmation with the same terms[7] plus a "pipeline" term: "Enable Gathering and Processing."[8] On January 25, Mercuria signed and returned Marathon's confirmation with checkmarks added near some of the terms but not next to the "Enable Gathering and Processing" term.[9]

---

[3] The Base Contract is attached to Marathon's Trial Brief on Dueling Transaction Confirmations (Marathon's TC Br.) as Exhibit 1 and to Mercuria's Brief Regarding the Controlling Terms of Its Agreement with Marathon (Mercuria's TC Br.) as Exhibit A. The Base Contract includes General Terms and Conditions and, when so elected by the parties, as is the case here, Special Provisions that modify and supplement the General Terms and Conditions.

[4] Mercuria TC Br., Exh. D; *see also* Mercuria Mot. Summ. J. at 3 n.2.

[5] Mercuria TC Br., Exh. D.

[6] Marathon TC Br., Exh. 3; Mercuria TC Br., Exh. B.

[7] Although the confirmations use different terminology for the delivery point, Mercuria says they refer to the same place, and Marathon does not dispute that here. *See* Marathon TC Br. at 13; Mercuria TC Br. at 5–6.

[8] The parties appear to agree that "Enable Gathering and Processing" is a gathering system rather than a pipeline. This opinion refers to the "Enable Gathering and Processing" term as the "pipeline" term only for simplicity and consistency with the parties' arguments.

[9] Marathon TC Br., Exh. 2; Mercuria TC Br., Exh. H at 72.

¶4      In the wake of Winter Storm Uri, Marathon declared force majeure in mid-February and delivered only 424,000 of the 560,000 MMBtu for the month.[10] Mercuria disputed Marathon's force-majeure declaration and brought this suit (and its predecessor in district court).

¶5      Because the putative pipeline term is potentially relevant to the force-majeure dispute in this case, the parties have briefed their disagreement over what constitutes the terms of their Contract. Marathon argues that the pipeline term is part of their Contract because Marathon's confirmation (1) is binding, (2) became part of the parties' Contract, and (3) either controls over Mercuria's confirmation or, alternatively, can be read together with Mercuria's confirmation. Mercuria argues that the pipeline term is not part of the parties' agreement because (1) the ICE Chat terms control; (2) Marathon's confirmation cannot vary or supplement the ICE Chat terms or the Base Contract's general terms; and (3) it rejected the pipeline term either by signing and returning Marathon's confirmation without a checkmark next to that term or by sending its own confirmation that included no pipeline term.

---

[10] *See* Mercuria's Orig. Answer & Countercl. at ¶ 12; Marathon Mot. Summ. J., Exh. 11.

**Analysis**

**A.** **The Court must apply the parties' contract as written, cognizant of the need for consistency in interpreting frequently used industry contract forms.**

¶6 The issue before the Court requires it to construe the parties' contract. The meaning of an unambiguous contract is a question of law for the courts.[11] When interpreting a contract, Texas courts begin with the text and "seek to ascertain the parties' intent as expressed in the plain language of the written agreement that won their mutual assent."[12] In short, we presume that the parties meant what they said in the contract,[13] and we construe what they said to mean "what an ordinary person using those words under the circumstances in which they are used would understand them to mean."[14] We read the entire agreement together as a whole, seeking to harmonize and give effect to all parts[15] and viewing the words in their textual context.[16]

---

[11] *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018). For purposes of the issues before the Court, the parties did not argue ambiguity.

[12] *Cromwell v. Anadarko E&P Onshore, LLC*, 716 S.W.3d 515, 522 (Tex. 2025).

[13] *See EIS Dev. II, LLC v. Buena Vista Area Ass'n*, 715 S.W.3d 689, 696 (Tex. 2025) (quoting *In re CenterPoint Energy Houston Elec., LLC*, 629 S.W.3d 149, 158–59 (Tex. 2021)).

[14] *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020) (quoting *URI*, 543 S.W.3d at 764). This involves giving the words their ordinary meaning, "absent some indication of different intent." *U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 23 (Tex. 2015).

[15] *Energen Res. Corp.*, 615 S.W.3d at 148; *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018); *Riverside Strategic Cap. Fund I, L.P. v. CLG Invs., LLC*, 2025 Tex. Bus. 33, ¶ 90, No. 25-BC01B-0006, 2025 WL 2419620, at *12 (1st Div.).

[16] *See Bd. of Regents of Univ. of Tex. Sys. v. IDEXX Labs., Inc.*, 691 S.W.3d 438, 444 (Tex. 2024); *see also Finley Res., Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332, 339–40 (Tex. 2023) (stating that words need not "carry every meaning to which [they are] naturally susceptible," as "language that might evoke multiple meanings if read in isolation will often be made more precise by its contextual use"); *see also Brown v. City of Houston*, 660 S.W.3d 749, 754 (Tex. 2023) (observing that

The relevant textual context may include, for example, the document's structure,[17] the text surrounding the disputed language,[18] the nature of the document,[19] the purpose reflected in the document,[20] word usage and grammar,[21] and punctuation.[22] In addition to this intrinsic context, Courts may consider "the facts and circumstances surrounding the [contract's] execution," but only to the extent it is "objectively determinable" and "informative, rather than transformative."[23]

---

context "is a primary determinant of meaning" (quoting Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012)).

[17] *U.S. Polyco, Inc. v. Tex. Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 390 n.3 (Tex. 2023) (per curiam); *see also Brown*, 660 S.W.3d at 754.

[18] *U.S. Polyco, Inc.*, 681 S.W.3d at 390 n.3; *In re Millwork*, 631 S.W.3d 706, 712–13 (Tex. 2021); *see also Brown*, 660 S.W.3d at 754.

[19] *Finley Res.*, 672 S.W.3d at 343. Notably, some types of contracts are subject to special rules. *See, e.g.*, *Energen*, 615 S.W.3d at 148 (observing that special interpretation rules apply to oil-and-gas leases and other contracts that determine interests in real property).

[20] *Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 808 (Tex. 2023); *Energen*, 615 S.W.3d at 148.

[21] *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). The relevant usage and linguistics are set at the time of contracting. *See Van Dyke v. Navigator Grp.*, 668 S.W.3d 353, 359–60 (Tex. 2023) (citing *Hysaw v. Dawkins*, 483 S.W.3d 1, 13 (Tex. 2016)).

[22] *U.S. Polyco*, 681 S.W.3d at 388; *Perryman v. Spartan Tex. Six Cap. Partners, Ltd.*, 546 S.W.3d 110, 120 (Tex. 2018); *Criswell v. Eur. Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990).

[23] *Cactus Water Servs., LLC v. COG Operating, LLC*, ___ S.W.3d ___, 2025 WL 1783686, at *7 (Tex. 2025) (quoting *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981)); *URI*, 543 S.W.3d at 767–68; *see also Energen*, 615 S.W.3d at 148; *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015); *Primexx Energy Opportunity Fund, LP v. Primexx Energy Corp.*, 2025 Tex. Bus. 9, ¶¶ 61–62, 709 S.W.3d 619, 635–36 (1st Div.).

¶7    The Base Contract is based on a form contract published by the North American Energy Standards Board (NAESB),[24] which has been interpreted by many other courts, including in force-majeure disputes arising out of Winter Storm Uri.[25] It is common in the oil-and-gas industry for parties to use contract forms and provisions that are "standard throughout the oil and gas industry" and "have been judicially interpreted many times over many years."[26] "To assure 'continuity and predictability' in oil-and-gas law, it is incumbent on the courts to construe commonly used terms in a uniform and predictable way."[27]

---

[24] "The NAESB is the consensus organization of United States oil and gas producers, and many of its standards have been adopted by both the federal and state governments." *Mieco, L.L.C. v. Pioneer Nat. Res. USA, Inc.*, 109 F.4th 710, 714 n.2 (5th Cir. 2024); *see also Luminant Energy Co. v. Koch Energy Servs., LLC,* 551 F. Supp. 3d 373, 379 n.5 (S.D.N.Y. 2021) ("NAESB is an organization that creates standards for the gas and electricity industries, including a 'Base Contract' for the sale of energy.").

[25] *See Freeport LNG Mktg., LLC v. Kinder Morgan Tex. Pipeline LLC*, No. 14-22-00864-CV, 2025 WL 1109028, at *8 (Tex. App.—Houston [14th Dist.] Apr. 15, 2025, no pet.); *Mieco*, 109 F.4th at 714; *Marathon Oil Co. v. Koch Energy Servs., LLC*, No. CV H-21-1262, 2025 WL 950085, at *1 (S.D. Tex. Mar. 28, 2025); *Targa Gas Mktg. LLC v. Koch Energy Servs., LLC*, No. CV H-21-1258, 2024 WL 5328564, at *4 (S.D. Tex. Dec. 18, 2024), *report and recommendation adopted,* 2025 WL 108190 (S.D. Tex. Jan. 14, 2025); *Unit Petroleum Co. v. Koch Energy Servs., LLC*, No. 4:21-CV-01260, 2023 WL 4828375, at *1–3 (S.D. Tex. July 27, 2023); *Marathon Oil Co. v. Koch Energy Servs., LLC* [*Marathon I*], No. 4:21-CV-1262, 2023 WL 4032879, at *3 (S.D. Tex. May 8, 2023), *report and recommendation adopted,* 2023 WL 4033332 (S.D. Tex. June 15, 2023); *LNG Ams., Inc. v. Chevron Nat. Gas*, No. CV H-21-2226, 2023 WL 2920940, at *1 (S.D. Tex. Apr. 12, 2023); *Ark. Okla. Gas Corp. v. BP Energy Co.*, No. 2:21-CV-02073, 2023 WL 3620746, at *1–16 (W.D. Ark. May 24, 2023); *Luminant*, 551 F. Supp. 3d at 375–80.

[26] *Devon Energy Prod. Co., L.P. v. Sheppard*, 668 S.W.3d 332, 346 (Tex. 2023) (quoting *French v. Occidental Permian Ltd.*, 440 S.W.3d 1, 8 (Tex. 2014)).

[27] *Devon*, 668 S.W.3d at 346 (citing *Wenske v. Ealy*, 521 S.W.3d 791, 798 (Tex. 2017)); *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 129 (Tex. 1996) (plurality op. on rehearing); *see also French*, 440 S.W.3d at 8 ("Careful adherence to those interpretations, and consistent application of them, is important to industry stability."); *Wenske*, 521 S.W.3d at 798 ("[W]e are acutely aware

¶8      Of course, parties are free to modify the form as they see fit, and those changes will be given effect; courts will not rely on "[r]igid, mechanical, arbitrary, and arcane rules" to provide "certainty at the expense of effectuating intent."[28] When parties use well-established industry forms without modification, it indicates an intent for the contract to operate in the manner courts have previously construed them. If the parties intend the contract to operate differently, they may modify the language to achieve that.

¶9      Finally, the Court recognizes that conflicting interpretations of identical contract language in a frequently used form can create predictability and planning issues in an industry. The Court will endeavor to avoid this to the extent it can do so consistent with the law and plain language of the contract.

**B.      Both confirmations are binding.**

¶10      The NAESB base contract allows parties to elect between written and oral transaction procedures in Section 1.2.[29] Marathon and Mercuria selected the

---

that parties who draft agreements rely on the principles and definitions pronounced by this Court. They rightly depend on us for continuity and predictability in the law, especially in the oil-and-gas field."); *Heritage Res.*, 939 S.W.2d at 129–30 ("In construing language commonly used in oil and gas leases, we must keep in mind that there is a need for predictability and uniformity as to what the language used means. Parties entering into agreements expect that the words they have used will be given the meaning generally accorded to them.").

[28] *Wenske*, 521 S.W.3d at 798; *see also Devon*, 668 S.W.3d at 346.

[29] Base Contract § 1.2. The principal difference between the Oral Transaction Procedure and the Written Transaction Procedure is that under the former, the agreement is binding when made orally, and the under the latter, the agreement is not binding until after the exchange of nonconflicting transaction confirmations or the deadline for objecting to the transaction confirmation(s).

oral transaction procedure.[30] Under this procedure, the parties can effectuate an "oral" agreement in two ways: a telephone call or an EDI (electronic data interchange) transmission.[31] Such an agreement is binding and treated as a signed writing.[32] "Notwithstanding" that, "the Confirming Party shall, and the other party may, confirm a telephonic transaction by sending the other party a Transaction Confirmation" within three business days.[33] Failure to send a confirmation does not invalidate the parties' "oral" agreement.[34]

¶11    Section 1.3 sets out a simple process for transaction confirmations, in which, subject to an exception discussed below,[35] timely transaction confirmations are binding unless the receiving party timely informs the sender of a disagreement by sending either (1) a written notice of the disagreement or (2) its own transaction confirmation reflecting the disagreement:

> If a sending party's Transaction Confirmation is materially different from the receiving party's understanding of the agreement referred to in Section 1.2, such receiving party shall notify the sending party via facsimile, EDI or mutually agreeable electronic means by the Confirm Deadline, unless such receiving party has previously sent a Transaction Confirmation to the sending party. The failure of the receiving party to so notify the sending party in writing by the Confirm Deadline

---

[30] *Id.* at p.2. They selected that the seller—in this case, Marathon—as the "Confirming Party" under the procedure. *Id.* They also elected to include certain "Special Provisions." *See id.* at pp.2, 14–16.

[31] *Id.* § 1.2.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *See* Part B(3), *infra.*

constitutes the receiving party's agreement to the terms of the transaction described in the sending party's Transaction Confirmation. If there are any material differences between timely sent Transaction Confirmations governing the same transaction, then neither Transaction Confirmation shall be binding until or unless such differences are resolved including the use of any evidence that clearly resolves the differences in the Transaction Confirmations.[36]

This process requires parties to identify disagreements over the transaction terms beforehand and limits their ability to identify putative disagreements for the first time after the fact.

### 1. The absence of a checkmark in a signed confirmation did not constitute notice of a disagreement on the terms.

¶12    Here, neither party sent the other a notice stating that a confirmation materially differed from their understanding of the agreement. Mercuria argues that even though it did not expressly object to the pipeline term, it did so implicitly by not placing a checkmark next to that term when it signed and returned Marathon's confirmation. But nothing about a party making check marks on a contract then signing and returning it necessarily indicates to the other party that the signer is *not* agreeing to the contract terms.[37] Mercuria's transmission email states only:

---

[36] Base Contract § 1.3; *see also id.* § 2.7 (defining the Confirm Deadline).

[37] To support its contrary argument, Mercuria cites *Penta v. Johnson*, No. 07-21-00238-CV, 2023 WL 187633, at *1 (Tex. App.—Amarillo Jan. 13, 2023, no pet.). But in that case a residential sale contract contained a list of potential financing with a checkbox next to each, allowing the parties to select among three different financing addendums: third-party financing, seller financing, and loan assumption. *Id.* The parties checked the seller financing box and no others. *Id.* When a dispute arose over whether the agreement allowed for third-party financing, the trial court held that it did not, and the court of appeals agreed. *Id.* at *3. This is similar to the checkboxes on the cover pages of the

"Attached is the executed confirmation."[38] This statement does not indicate that Mercuria "rejected" any terms, as it now asserts. To the contrary, both parties proceeded as if there were no problems, and neither party initiated any effort to resolve material differences or indicated any expectation that the parties would do so.

¶13    Moreover, Mercuria has pointed to nothing in the Base Contract, the parties' interactions in this instance, or their prior course of dealing that would put Marathon on notice that Mercuria intended the absence of a check mark on the signed confirmation to constitute notice that the confirmation materially differed from its understanding of the agreement. In fact, the summary judgment evidence indicates the opposite. In the parties' transaction for the preceding month, January 2021, Mercuria also signed and returned Marathon's confirmation notice with checkmarks next to some terms but not others.[39] The confirmation contained the

---

Base Contract, where the parties selected different terms (such as Oral Transaction Procedure) by checking which option they chose. *See* Base Contract at pp.1–2. But it is dissimilar to the Marathon Confirmations, which contained no check boxes, no list of pipeline options for the parties to select among, and no text indicating that checkmarks were to be used to adopt or reject terms. Marathon TC Br., Exh. 2; Mercuria TC Br., Exh. H. Mercuria also cites *Hastings v. Bonner*, 578 F.2d 136, 139–140 (5th Cir. 1978). That case also involved an offer letter with two checkboxes: one for acceptance and another to reject the offer. The appellant checked the acceptance box but wrote under it: "Provided that I or my representative first have the opportunity to address the school board in regard to why a continuing contract was not offered to me and the reasons for the denial of that contract to me." *Id.* at 140. The Court concluded that the appellant's acceptance was conditional based on the language she added next to the checkmark. *Id.* Again, this is dissimilar to the Marathon Confirmations, which contained no checkboxes, no alternative pipelines for the parties to choose between, and no written note from Mercuria indicating that its acceptance was conditional or that it did not accept the pipeline term.

[38] Marathon TC Br., Exh. 2; Mercuria TC Br., Exh. H.

[39] Marathon TC Br., Exh. 4.

same pipeline term ("Enable Gathering and Processing"). In that instance, the pipeline term was checked but the "firm" obligation term was not checked. Nevertheless, Mercuria does not deny that it had, in fact, agreed to a "firm" transaction.

¶14   This evidence also undermines Mercuria's contention that it would never have agreed to a pipeline term because doing so undermines the key benefit of purchasing gas at a pool (like the EOIT West Pool here): "that there are multiple paths in and multiple paths out."[40] Under Mercuria's theory, Mercuria accepted the exact same "pipeline" term ("Enable Gathering and Processing") for the January 2021 transaction between Mercuria and Marathon by placing a checkmark next to it, even though it called for delivery to the same pool.[41] That, too, would have deprived Mercuria of its claimed benefit of purchasing gas at a pool with multiple paths in and out—yet Mercuria checked the term anyway.

¶15   Thus, the first means of disputing a confirmation term—timely notice that the confirmation did not comport with the parties' agreement—was not utilized here. The Court turns to the second means: a competing confirmation reflecting a material difference in terms.

---

[40] Mercuria TC Resp. at 9–10.

[41] Marathon TC Br., Exh. 4.

## 2. The confirmations did not materially differ when the party responsible for delivery specified a delivery term on which the buyer was silent.

¶16    As shown above, under Section 1.3, when both parties send a timely confirmation, as occurred here, whether the confirmations are binding depends on whether they materially differ.[42] If they materially differ, neither confirmation is binding unless or until such differences are resolved.[43]  Here, the Court concludes that the confirmations do not materially differ.

¶17    In reaching that conclusion, the Court considers a recent opinion out of the Southern District of Texas in *Marathon Oil Co. v. Koch Energy Services* (*Marathon I*) that likewise addressed the effect of competing transaction confirmations under an NAESB base contract in the context of a force-majeure dispute arising in the wake of Winter Storm Uri.[44] The parties in *Marathon I* were represented by the same law firms that represent the parties in this case, and Marathon is a party to both cases. There too, the parties selected the oral transaction procedure[45] and their "oral" agreement was reached via an ICE Chat,[46] after which both parties sent transaction confirmations.[47] There too, the parties disputed whether a pipeline term in

---

[42] Base Contract § 1.3. Again, this is subject to the exception discussed below.

[43] *Id.*

[44] *Marathon I*, 2023 WL 4032879, at *5–11.

[45] *Id.* at *1.

[46] Koch's Mot. for Partial Summ. J. at 3, *Marathon I*, No. 4:21-CV-1262 (S.D. Tex. Mar. 29, 2023), ECF No. 117.

[47] *Marathon I*, 2023 WL 4032879, at *2.

Marathon's confirmation that was not also present in Koch's confirmation was part of the parties' Contract. Applying the same definition of Contract applicable here, the *Marathon I* court held that the base contract and any binding transaction confirmations should be read together as one integrated agreement governing the parties' transaction.[48]

¶18   Arguably, there was even greater potential for a material difference between the confirmations in *Marathon I* because the comparison was not between a confirmation with a delivery pipeline term and a confirmation that was silent on that term; instead, the confirmations contained two different (but ultimately not conflicting) pipeline terms. Marathon, the seller there too, specified in its confirmation the pipeline it would use for delivery.[49] Koch, the buyer, specified in its confirmation the pipeline it would use to take the gas.[50] Both confirmations were silent as to the pipeline to be used by the other party.[51] The court held that there was not a material difference between the two confirmations, which were instead "complementary" because each party designated the part of the transportation route for which it was

---

[48] *Id.* The court also pointed out that "several courts interpreting NAESB Base Contracts have looked to the Transaction Confirmations incorporated into the contract to determine whether a party was permitted to invoke Force Majeure." *Id.* (citing *Hess Corp. v. ENI Petroleum US, LLC*, 435 N.J. Super. 39, 49 (N.J. App. Div. 2014); *Va. Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397, 399–409 (Tex. App.—Houston [14th Dist.] 2009, pet. denied)).

[49] *Marathon I*, 2023 WL 4032879, at *2.

[50] *Id.*

[51] *Id.*

responsible.[52] Similar to Mercuria here, Koch argued "the absence of a designated incoming pipeline in its Transaction Confirmations evidences its intent that Marathon's performance was not limited to the Midship pipeline."[53] The district court disagreed, reasoning that reading such a term into Koch's silence "would require adding words to Koch's Transaction Confirmations, something the Court cannot do when interpreting a contract as written."[54]

¶19    This Court agrees with the reasoning in *Marathon I* on this issue and holds that the absence of any pipeline in Mercuria's confirmation does not conflict with the designation of a delivery pipeline in Marathon's confirmation.[55] As the seller, solely responsible for delivery under the Base Contract,[56] it makes sense for Marathon to identify the means of delivery.[57] If Mercuria wanted the agreement not to include any such delivery specification, it could have told Marathon that or so stated its own confirmation. Like Koch, Mercuria did neither.

---

[52] *Id.* at *11.

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] Base Contract §§ 1.1, 4.1.

[57] *See Marathon I*, 2023 WL 4032879, at *11 ("Marathon's identification of the pipeline flowing *to Bennington Hub* corresponds with its sole responsibility to transport natural gas *to the Delivery Point*, while Koch's identification of a pipeline flowing *from Bennington Hub* corresponds with its sole responsibility to transport the natural gas *from the Delivery Point*.").

¶20    Because Marathon and Mercuria's confirmations do not materially differ, both are binding unless an exception applies.[58]

### 3.  The pipeline term is a commercial term of the transaction.

¶21    Section 1.2 recognizes an exception to Section 1.3's general, deemed-acceptance approach: if a transaction confirmation "contains any provisions other than those relating to the commercial terms of the transaction (i.e., price, quantity, performance obligation, delivery point, period of delivery and/or transportation conditions), which modify or supplement the Base Contract or General Terms and Conditions of this Contract (e.g., arbitration or additional representations and warranties), such provisions shall not be deemed to be accepted pursuant to Section 1.3 but must be expressly agreed to by both parties; provided that the foregoing shall not invalidate any transaction agreed to by the parties."[59]

At a recent summary-judgment hearing, Mercuria argued that the pipeline term would modify the Base Contract's force-majeure provision, such that it could not be deemed accepted and had to be expressly agreed to by both parties. The Court disagrees. The distinction drawn by the contract is between transaction-specific terms ("the commercial terms of the transaction"—"price, quantity, performance obligation, delivery point, period of delivery and/or transportation conditions") and

---

[58] Base Contract §§ 1.2–.3, 2.9; *see also Marathon I*, 2023 WL 4032879, at *6–10.

[59] Base Contract § 1.2.

the global terms the parties have adopted to govern any transactions under the Base Contract (such as "arbitration or additional representations and warranties").[60] The pipeline term falls into the first category and relates to the "performance obligation" and/or "transportation conditions" for the February 2021 transaction.[61] While the pipeline term has the potential to impact how the force-majeure clause operates in the context of this transaction, so do several of the other transaction-specific terms listed. As a "commercial term[] of the transaction," the pipeline term does not require express agreement under the exception in Section 1.2. Because no exception applies, then, both Marathon and Mercuria's transaction confirmations are binding.

## C. The confirmations, and not the ICE Chat, combine with the Base Contract to form the parties' Contract.

¶22    Mercuria argues that the ICE Chat, not the transaction confirmations, formed part of the parties' contract. The Court disagrees. The Base Contract defines the "Contract" as the legally binding relationship established by (i) the Base Contract, (ii) "any and all binding Transaction Confirmations," and (iii) "any and all transactions that the parties have entered into through an EDI transmission or by telephone, but that have not been confirmed in a binding Transaction Confirmation"—"all of which shall form a single, integrated agreement between the

---

[60] *Id.*

[61] *See id.* Notably, the Base Contract defines "Transaction Confirmation" as "setting forth the terms of a transaction formed pursuant to Section 1 for a particular Delivery Period." *Id.* § 2.32.

parties."[62] Because a telephonic or EDI transaction (like the ICE Chat here) is part of the Contract only if it "ha[s] not been confirmed in a binding transaction confirmation," the Contract's makeup turns on whether the parties' transaction confirmations are "binding." If the EDI transaction was confirmed in a binding transaction confirmation, the Contract consists of the Base Contract plus the binding confirmation(s); if there is no binding transaction confirmation, the Contract consists of the Base Contract plus the EDI transaction. These components form an "integrated agreement,"[63] and any prior agreements about the transaction are "merged into and superseded by" the Contract.[64] Thus, because their confirmations are binding, the parties' Contract consists of the Base Contract (including its general and special provisions adopted by the parties) and both confirmations, read together.

**D.     This result is not altered by whether the confirmations were permissive or mandatory or whether they were signed by the recipient.**

¶23     Mercuria argues that the Base Contract requires transaction confirmations for only "telephonic transactions," not EDI transactions, and at least implies

---

[62] *Id.* § 2.9. It also lays out the order of priority in the event of a conflict among them: binding transaction confirmations control, followed by the terms of the "oral" agreement, then the Base Contract and its general terms and conditions. *Id.* § 1.3.

[63] *Id.* § 2.9.

[64] *Id.* § 15.4 ("This Contract sets forth all understandings between the parties respecting each transaction subject hereto, and any prior contracts, understandings and representations, whether oral or written, relating to such transactions are merged into and superseded by this Contract and any effective transaction(s). This Contract may be amended only by a writing executed by both parties.").

that this means the parties' confirmations are ineffective here.[65] Marathon argues the opposite: the Base Contract requires the Confirming Party to send a transaction confirmation regardless of whether the transaction is originally entered by phone or EDI transmission. Marathon also indicates that its confirmation trumps Mercuria's either because Marathon is the Confirming Party or because Marathon did not sign and return Mercuria's Confirmation.[66] The Court's conclusion is not changed by these theories.

¶24    First, regardless of whether the Oral Transaction Procedure *requires* transaction confirmations for EDI transactions (like the ICE Chat here), it does not expressly *prohibit* them, and both parties sent them. Mercuria appears to have understood at the time of the transaction that confirmations were permissible: not only did Mercuria send Marathon a confirmation, but it was the first party to send one.[67] And the evidence indicates that this is a common procedure for Mercuria.[68] Additionally, Mercuria signed and returned Marathon's confirmation. While the sentence obligating the Confirming Party to send a confirmation distinguishes

---

[65] Mercuria TC Br. at 8–9; *see also* Base Contract § 1.2 ("Confirming Party shall, and the other party may, confirm a *telephonic transaction* by sending the other party a Transaction Confirmation ... within three Business Days of a transaction covered by this Section 1.2 (Oral Transaction Procedure) provided that the failure to send a transaction confirmation shall not invalidate the oral agreement of the parties." (emphasis added)).

[66] Marathon TC Resp. at 3–4.

[67] Mercuria TC Br., Exh. B.

[68] *See, e.g.*, Marathon TC Resp., Exh. 5 at 33:9–11, 34:4–9, 69:20–70:8, 71:6–13.

between telephonic and EDI transactions (at least at one point), none of the Base Contract's other references to confirmations contain a similar distinction. To the contrary, the Base Contract defines the "Contract" to include only "transactions that the parties have entered into *through an EDI transmission or by telephone*, but *that have not been confirmed in a binding Transaction Confirmation*."[69] This indicates that binding confirmations may follow either an EDI or telephonic transaction.

¶25 Second, the Base Contract specifically contemplates both mandatory and permissive confirmations[70] and does not distinguish between mandatory and permissive confirmations for purposes of whether a confirmation is binding[71] or which terms control in the event of a conflict between them.[72] Thus, regardless of whether the Base Contract required Marathon to send a confirmation as the Confirming Party, Marathon did so and that confirmation has the same effect whether it

---

[69] Base Contract § 2.9 (emphases added).

[70] *Id.* §§ 1.2–.3.

[71] The Base Contract only ever mandates that the Confirming Party send a transaction confirmation, though it allows another party to do so. *Id.* Yet it contemplates that there may be more than one binding confirmation for a given transaction, indicating that permissive confirmations may also be binding. *Id.* §§ 1.2–.3. And all binding confirmations are integrated into the agreement. *Id.* § 1.3; *see also Marathon I*, 2023 WL 4032879, at *3.

[72] Instead, all binding confirmations are given priority over other parts of the agreement. Base Contract § 1.3 ("In the event of a conflict among the terms of (i) a binding Transaction Confirmation pursuant to Section 1.2, (ii) the oral agreement of the parties which may be evidenced by a recorded conversation, where the parties have selected the Oral Transaction Procedure of the Base Contract, (iii) the Base Contract, and (iv) these General Terms and Conditions, the terms of the documents shall govern in the priority listed In this sentence.").

was mandatory or permissive. Likewise, the fact that Marathon was the Confirming Party does not give Marathon's Confirmation any greater priority than Mercuria's.

¶26 Finally, the Base Contract does not require a party to sign and return a transaction confirmation for it to be binding. Instead, it provides that confirmations are deemed accepted unless the receiving party takes action to reject it, either by notifying the sending party that the confirmation is materially different from the receiving party's understanding of the agreement or by timely sending a confirmation of its own reflecting such material difference.[73] Likewise, it does not grant a signed and returned confirmation any greater priority to any other confirmations. While a signature is a common way to show acceptance of a contract's terms, a signature is not required for acceptance under the Base Contract.[74]

¶27 In sum, to the extent Mercuria argues that transaction confirmations are not permitted for EDI-based transactions (which Mercuria does not explicitly say, perhaps not wanting to label its own confirmations as ineffective), the Court disagrees. To the extent Marathon argues that its transaction confirmation trumps Mercuria's because Marathon is the Confirming Party, because Marathon did not sign Mercuria's confirmation or because Mercuria did sign Marathon's confirmation, the Court again disagrees. Instead, the Court concludes that because both

---

[73] Base Contract § 1.3.

[74] *Id.*

21

parties sent timely transaction confirmations, the confirmations' effectiveness is governed by the Base Contract in the manner described above regardless of whether the confirmations were mandatory or permissive and regardless of whether the receiving party signed the confirmation.

## Conclusion

¶28    The Court holds that both parties' transaction confirmations are part of the Contract, as defined in Section 2.9, and neither party's confirmation trumps the other's; instead, the confirmations must be read together with the Base Contract as a single, integrated agreement. Whether and how this holding may affect what is required under the Contract or what constitutes "reasonable efforts" under the Contract is beyond the scope of this order and opinion.

Date signed: September 18, 2025

Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division, *sitting by designation
in the Eleventh Division*

22

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 105774073
Filing Code Description: No Fee Documents
Filing Description: Issue 3 Opinion
Status as of 9/18/2025 1:20 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Uddin | | muddin@azalaw.com | 9/18/2025 12:30:14 PM | SENT |
| Timothy C.Shelby | | tshelby@azalaw.com | 9/18/2025 12:30:14 PM | SENT |
| David T. McDowell | | david.mcdowell@mhllp.com | 9/18/2025 12:30:14 PM | SENT |
| Mark Trachtenberg | | mark.trachtenberg@haynesboone.com | 9/18/2025 12:30:14 PM | SENT |
| Sammy Ford | | sford@azalaw.com | 9/18/2025 12:30:14 PM | SENT |
| Valerie Koinis | | vkoinis@azalaw.com | 9/18/2025 12:30:14 PM | SENT |
| Ryan Pitts | | ryan.pitts@haynesboone.com | 9/18/2025 12:30:14 PM | SENT |
| Alejandra Ramos | | aramos@azalaw.com | 9/18/2025 12:30:14 PM | SENT |
| Garrett Martin | | garrett.martin@haynesboone.com | 9/18/2025 12:30:14 PM | SENT |
| Paul Galante | | PGalante@azalaw.com | 9/18/2025 12:30:14 PM | SENT |
| Emily Adler | | eadler@azalaw.com | 9/18/2025 12:30:14 PM | SENT |
| AZA Service Email Address | | service@azalaw.com | 9/18/2025 12:30:14 PM | SENT |
| Ab Henry | | ahenry@azalaw.com | 9/18/2025 12:30:14 PM | SENT |
| William B.Thomas | | william.thomas@mhllp.com | 9/18/2025 12:30:14 PM | SENT |
| Mary E.Green | | mary.green@mhllp.com | 9/18/2025 12:30:14 PM | SENT |
| Rachel HBartenfeld | | rachel.bartenfeld@haynesboone.com | 9/18/2025 12:30:14 PM | SENT |
| William King | | william.king@mhllp.com | 9/18/2025 12:30:14 PM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 9/18/2025 12:30:14 PM | SENT |
| Richard Hood | | richard.hood@mhllp.com | 9/18/2025 12:30:14 PM | SENT |