

**The Business Court of Texas,**
**11th Division**

| | | |
|---|---|---|
| MARATHON OIL CO., | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Cause No. 25-BC11A-0013 |
| | § | |
| MERCURIA ENERGY AMERICA, | § | |
| LLC, | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

═══════════════════════════════════════

### *Syllabus*[*]

═══════════════════════════════════════

In this force-majeure dispute arising out of Winter Storm Uri, parties to a contract for the sale of natural gas dispute whether the seller should have (i) purchased gas on the spot market to cover any production shortfall or (ii) bought back its delivery obligation. The Court holds that the parties' contract did not obligate the seller to take either action as a prerequisite or alternative to declaring force majeure or as a contractually required "reasonable effort."

---

[*] The syllabus was created by court staff and is provided for the convenience of the reader. It is not part of the Court's opinion, does not constitute the Court's official description or statement, and should not be relied upon as legal authority.

2025 Tex. Bus. 39



**The Business Court of Texas,
11th Division**

| | | |
|---|---|---|
| MARATHON OIL CO., | §<br>§<br>§ | |
| *Plaintiff,* | §<br>§ | Cause No. 25-BC11A-0013 |
| v. | § | |
| MERCURIA ENERGY AMERICA, LLC, | §<br>§ | |
| *Defendant.* | §<br>§ | |

---

**OPINION**

---

¶1    The parties dispute whether the force-majeure clause in their contract excused Marathon's failure to deliver natural gas to Mercuria in February 2021, in the wake of Winter Storm Uri. Among other things, Mercuria argues that Marathon should have (a) purchased gas on the spot market to meet its delivery obligations or (b) bought back its delivery obligation. The Court holds that the contract did not require Marathon to do either. First, the parties added language to the force-majeure clause—"the party claiming excuse shall have no obligation to seek alternative Gas supplies in order to satisfy any obligation hereunder"—that relieved Marathon of

any obligation to seek spot-market gas. Second, the clause's "reasonable efforts" duty does not encompass buybacks, which would render the clause ineffective.

## Background

¶2 Marathon and Mercuria entered into a base contract for the sale and purchase of natural gas (the Base Contract),[1] which is based on a form published by the North American Energy Standards Board (NAESB).[2] In January 2021, they agreed that Marathon would sell Mercuria natural gas each day in February 2021 at the EOIT West Pool, under the Base Contract. The parties exchanged transaction confirmations reflecting this agreement, which integrate with the Base Contract to form the relevant agreement (the Contract). When Winter Storm Uri hit, Marathon declared force majeure and did not deliver the full amount of gas promised. Mercuria disputed Marathon's declaration of force majeure, resulting in this suit (and its predecessor in district court).[3]

---

[1] The Base Contract is attached to Marathon's Motion for Traditional and No-Evidence Partial Summary Judgment (Marathon MSJ) as Exhibit 1 and to Mercuria's Response as Exhibit 1A.

[2] "The NAESB is the consensus organization of United States oil and gas producers, and many of its standards have been adopted by both the federal and state governments." *Mieco, L.L.C. v. Pioneer Nat. Res. USA, Inc.*, 109 F.4th 710, 714 n.2 (5th Cir. 2024); *see also Luminant Energy Co. v. Koch Energy Servs., LLC,* 551 F. Supp. 3d 373, 379 n.5 (S.D.N.Y. 2021) ("NAESB is an organization that creates standards for the gas and electricity industries, including a 'Base Contract' for the sale of energy.").

[3] Additional details about the background in this case can be found in the Court's prior opinion. *Marathon Oil Co. v. Mercuria Energy Am., LLC* [*Mercuria*], 2025 Tex. Bus. 36, ___ S.W.3d ___ (11th Div.).

¶3    Both parties moved for partial summary judgment,[4] and the Court granted in part and denied in part both motions.[5] Having determined that analysis relating to the Court's holdings on the replacement-gas and buyback issues will benefit the parties and the jurisprudence, the Court issues this opinion.

## Rules of Contract Construction

¶4    The issue before the Court requires it to construe the Base Contract. The meaning of an unambiguous contract is a question of law for the courts.[6] The Court has laid out Texas's general rules of contract construction in its prior opinion in this case.[7] In short, the Court holds parties to what they said in the contract and interprets what they said to mean what an ordinary person reading the contract would think it means.[8] What an ordinary reader understands words to mean can be influenced by the context in which the words are written, so courts read the contract as a whole and consider things like the contract's structure, the text surrounding the disputed language, the nature of the contract, the purpose reflected in the contract, word usage, grammar, and punctuation.[9]

---

[4] Marathon MSJ; Mercuria's Mot. for Summ. J. (Mercuria MSJ).

[5] *See* Order on Marathon MSJ (Sept. 19, 2025); Order on Mercuria MSJ (Sept. 19, 2025).

[6] *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018). The parties did not argue ambiguity here.

[7] *Mercuria*, 2025 Tex. Bus. 36, ¶ 6, ___ S.W.3d at ___ (listing authority).

[8] *Id.*

[9] *Id.* And, of course, if the contract defines terms or otherwise shows that its words are intended to mean something different than usual, a reasonable reader would accept that.

¶5     The Base Contract is based on an NAESB contract form that has been interpreted by many other courts, including in other force-majeure disputes arising out of Winter Storm Uri.[10] As discussed in the Court's prior opinion in this case, it is incumbent upon courts to protect the "continuity and predictability" provided by such forms by construing them in a "uniform and predictable way."[11] Parties who prefer a different outcome may modify the form as they see fit, and such modifications will be given effect without disrupting the industry's reliance on the forms to operate in accordance with the parties' reasonable expectations.[12]

**The Force-Majeure Provision**

¶6     Section 11 of the NAESB form contract is the force-majeure provision. Sections 11.1, 11.2, and 11.3 work together to delineate the parameters of what

---

[10] *See Freeport LNG Mktg., LLC v. Kinder Morgan Tex. Pipeline LLC*, No. 14-22-00864-CV, 2025 WL 1109028, at *8 (Tex. App.—Houston [14th Dist.] Apr. 15, 2025, no pet.); *Mieco*, 109 F.4th at 714; *Marathon Oil Co. v. Koch Energy Servs., LLC* [*Marathon II*], No. CV H-21-1262, 2025 WL 950085, at *1 (S.D. Tex. Mar. 28, 2025); *Targa Gas Mktg. LLC v. Koch Energy Servs., LLC* [*Targa/Koch II*], No. CV H-21-1258, 2024 WL 5328564, at *4 (S.D. Tex. Dec. 18, 2024), *report and recommendation adopted,* 2025 WL 108190 (S.D. Tex. Jan. 14, 2025); *Unit Petroleum Co. v. Koch Energy Servs., LLC*, No. 4:21-CV-01260, 2023 WL 4828375, at *1–3 (S.D. Tex. July 27, 2023); *Marathon Oil Co. v. Koch Energy Servs., LLC* [*Marathon I*], No. 4:21-CV-1262, 2023 WL 4032879, at *3 (S.D. Tex. May 8, 2023), *report and recommendation adopted,* 2023 WL 4033332 (S.D. Tex. June 15, 2023); *LNG Ams., Inc. v. Chevron Nat. Gas*, No. CV H-21-2226, 2023 WL 2920940, at *1 (S.D. Tex. Apr. 12, 2023); *Ark. Okla. Gas Corp. v. BP Energy Co.*, No. 2:21-CV-02073, 2023 WL 3620746, at *1–16 (W.D. Ark. May 24, 2023); *Luminant*, 551 F. Supp. 3d at 375–80.

[11] *Mercuria*, 2025 Tex. Bus. 36, ¶ 6, ___ S.W.3d at ___ (citing *Devon Energy Prod. Co., L.P. v. Sheppard*, 668 S.W.3d 332, 346 (Tex. 2023); *Wenske v. Ealy*, 521 S.W.3d 791, 798 (Tex. 2017); *French v. Occidental Permian Ltd.*, 440 S.W.3d 1, 8 (Tex. 2014); *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 129–30 (Tex. 1996) (plurality op. on rehearing)).

[12] *Id.* (citing *Wenske*, 521 S.W.3d at 798; *Devon*, 668 S.W.3d at 346).

4

constitutes force majeure. Section 11.1 defines force majeure broadly: "any cause not reasonably within the control of the party claiming suspension, as further defined in Section 11.2";[13] Section 11.2 identifies a subset of events that are the common examples of force majeure;[14] and Section 11.3 identifies events that a party cannot rely on to claim force majeure even if they fall within the broad definition of causes outside the parties' control.[15] Additionally, Section 11.2 imposes a duty on any party claiming force majeure to "make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance."[16]

¶7    Parties who use the NAESB form contract can modify its standard terms through special provisions, and the parties did so here. Special Provision 5 modified Section 11.1 of the Base Contract. As modified, Section 11.1 provides in relevant part:

> [N]either party shall be liable to the other for failure to perform ... , to the extent such failure was caused by Force Majeure *and the party claiming excuse shall have no obligation to seek alternative Gas supplies in order to satisfy any obligation hereunder*.[17]

---

[13] Base Contract § 11.1.

[14] *Id.* § 11.2.

[15] *Id.* § 11.3. As discussed below, some of the items listed in Section 11.3 are excluded *unless* they fall within Section 11.2. *Id.* § 11.3(iv), (v).

[16] *Id.* § 11.2.

[17] *Id.* § 11.1, Special Provision 5 (emphasis added).

In this quote, the italicized language is what Special Provision 5 added.

**Analysis**

¶8   As discussed below, the Court concludes that Marathon had no duty under the parties' Contract to buy replacement gas on the spot market to meet its February 2021 delivery obligations to Mercuria or to buy back that delivery obligation—whether before or instead of declaring force majeure or to satisfy its "reasonable efforts" obligation under the force-majeure clause.

**A.    Marathon was not obligated to buy replacement gas.[18]**

¶9   The parties dispute whether Special Provision 5 relieved Marathon of (a) any obligation to buy gas on the spot market to fulfill its delivery obligations to Mercuria in an event of force majeure or (b) only its obligation to buy spot-market gas *at other locations* besides West Pool, the contractual delivery location. This issue turns largely on whether the term "alternative gas supply" includes spot-market gas available at West Pool. The Court concludes that it does, such that Special Provision 5 relieved Marathon of any duty to buy spot-market gas, whether at West Pool or elsewhere.

---

[18] The summary-judgment briefing and order use the term "replacement gas." The Court recognizes that term could have different connotations in different contexts. What is at issue here is gas that Marathon could have purchased from third parties on the spot market to meet its February 2021 delivery obligations to Mercuria.

**1. Without Special Provision 5, Marathon would not have to buy spot-market gas to invoke force majeure but might have to as a "reasonable effort."**

¶10    The phrase "alternative Gas supplies" is specific to this Contract and is not the subject of prior decisions. But courts have construed the similar phrase "Seller's Gas supply" in Section 11.3 of the NAESB form contract, and both parties rely on such cases here. Those cases are relevant here because they define the phrase "Gas supply" and tell us what Marathon's duty would have been without Special Provision 5: Marathon would not be obligated to purchase spot-market gas to rely on the force-majeure clause to excuse delivery, but it *might* have a duty to do so as a "reasonable effort" under Section 11.2.

**a. *Virginia Power***

¶11    First, the Fourteenth Court of Appeals defined "Gas supply" in *Virginia Power Energy Marketing, Inc. v. Apache Corp.*, a suit arising out of Apache's declaration of force majeure under an NAESB form contract after Hurricanes Rita and Katrina.[19] The parties disputed what constituted Apache's "Gas supply," as that term is used in Section 11.3(v), which provides that force majeure does <u>not</u> apply "to the extent performance is affected by … the loss or failure of Seller's Gas supply or depletion of reserves, <u>except</u> … as provided in Section 11.2."[20] Under this provision, Apache could prevail on its force-majeure claim only if a Section 11.2

---

[19] 297 S.W.3d 397, 399 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

[20] Base Contract § 11.3(v) (emphasis added).

event—the hurricanes—caused the loss of its "Gas supply."[21] Virginia Power argued that "Gas supply" included Apache's uncommitted gas from the same geographic region that could have been used to meet Apache's delivery obligation to Virginia Power, such that Apache would need to prove that the hurricanes caused the loss of all such gas.[22] Apache argued that its "Gas supply" included only the gas from specific offshore production platforms that Apache had internally earmarked for the contract, such that it need only show that the hurricanes caused it to lose the gas from those platforms.[23]

¶12    The court of appeals agreed with Virginia Power. Applying the NAESB form contract's definition of "Gas" ("any mixture of hydrocarbons and noncombustible gases in a gaseous state consisting primarily of methane") and the ordinary meaning of "supply" ("a quantity or amount that is 'available for use'"), the court held that "Gas supply," as used in the NAESB form contract, means "the amount or quantity of gas that was available to satisfy VPEM's contractual demands."[24]

---

[21] *Va. Power*, 297 S.W.3d at 404; *see also Mieco*, 109 F.4th at 720–21 (consistently construing Section 11.3 to mean that loss of seller's gas supply will not trigger force majeure unless it "was caused by one of the events listed in Section 11.2, such as a 'weather related event[] affecting an entire geographic region," including Winter Storm Uri).

[22] *Va. Power*, 297 S.W.3d at 405.

[23] *Id.* at 407. This analysis applies only to Apache's delivery obligations at one delivery point at issue in *Virginia Power*. Apache had separate obligations to deliver gas at another delivery point that was damaged by the hurricanes, preventing delivery. *Id.* at 403–04. The Court held that the "reasonable efforts" requirement did not obligate Apache to deliver at an alternative location. *Id.*

[24] *Id.* at 407.

Because Apache had not shown that it had no gas available from sources other than the internally designated platforms, the court held there was a fact issue as to whether Apache had available gas that could have been used to fulfil its obligation to Virginia Power, as necessary to rely on the force-majeure clause.[25]

¶13 Notably, the trial court in *Virginia Power* ruled that "Apache was not legally obligated to purchase gas on the spot market to meet its contractual commitment to" Virginia Power, and Virginia Power did not appeal that decision.[26] It was thus undisputed on appeal that the force-majeure provision did not obligate Apache to purchase spot-market gas, and the parties fought only over what portion of Apache's *own* gas it was required to deliver. In fact, the court of appeals observed in an earlier case that the plain language of the NAESB form contract indicated that the duty to purchase gas on the spot market at prices inflated by a force-majeure-caused supply shortage was "the very obligation" the seller sought to avoid by negotiating a force-majeure clause in the contract.[27]

---

[25] *Id.* at 407–08. The Court pointed to evidence that Apache (a) had available uncommitted gas in the same geographical area that could have been used to fulfill its contractual obligations but was instead offered to new customers at higher prices and (b) sold spot-market gas to Virginia Power at two other points along the same pipeline as the delivery point. *Id.*

[26] *Id.* at 407 n.13.

[27] *Tejas Power Corp. v. Amerada Hess Corp.*, No. 14-98-00346-CV, 1999 WL 605550, at *3 (Tex. App.—Houston [14th Dist.] Aug. 12, 1999, no pet.).

### b. *Mieco*

¶14    The spot-market gas ruling that was uncontested in *Virginia Power* was contested in *Mieco, L.L.C. v. Pioneer Natural Resources USA, Inc.*, a force-majeure dispute arising under an NAESB form contract in the wake of Winter Storm Uri.[28] Like in *Virginia Power*, the *Mieco* parties disputed what gas the seller, Pioneer, had to show was unavailable—i.e., what gas was included in "Seller's gas supply." Pioneer argued that "Seller's gas supply" meant the Permian Basin gas it regularly produced from its crude oil operations in the Permian Basin; Mieco argued that it included gas available for Pioneer to purchase on the spot market for the delivery point.[29]

¶15    The Fifth Circuit adopted Pioneer's position that its "Gas supply" was the gas it produced in the Permian Basin.[30] The court reasoned that, while Pioneer sometimes purchased gas on the spot market to make up for shortfalls, the "vast majority" of the gas it sold was residue gas from its operations in the Permian Basin, which was what Pioneer considered its "gas supply."[31] The court cited

---

[28] 109 F.4th 710 (5th Cir. 2024). Pursuant to the parties' contract, the *Mieco* court applied New York law. *Id.* at 716. But the court indicated that Texas and New York law were indistinguishable on this issue.

[29] *Id.* at 713, 721–22.

[30] *Id.* at 713.

[31] *Id.* at 713; *see also Targa/Koch II*, 2024 WL 5328564, at *1–6 (following *Mieco* but declining to grant summary judgment that seller "had no obligation under any circumstances to purchase replacement gas"); *Targa Gas Mktg. LLC v. Mieco LLC* [*Targa/Mieco*], No. CV H-21-1128, 2023 WL

---

10

numerous consistent federal cases,[32] and also relied in part on *Virginia Power*: "*Virginia Power* interpreted 'Seller's gas supply' to embrace only gas the seller owned and could physically deliver to the buyer—not spot market gas."[33] The court also noted that, while the contract language was unambiguous, it would have reached the same conclusion even if it were ambiguous, relying in part on the fact that the NAESB drafting committee repeatedly rejected efforts to amend the form contract so that force majeure would not excuse performance when gas could be purchased on the spot market for the delivery point.[34]

¶16     *Mieco* raised another issue not raised in *Virginia Power*: how did the availability of spot-market gas impact Pioneer's duty under Section 11.2 to "make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance"?[35] Despite having held that Pioneer did not have a duty to purchase spot-market gas

9546743, at *5, *6 (S.D. Tex. Aug. 8, 2023) (following the trial court in *Mieco* and granting summary judgment that contract did not require seller to purchase replacement gas).

[32] *Mieco*, 109 F.4th at 723 n.17 (citing *Canadian Breaks LLC v. JPMorgan Chase Bank, N.A.*, No. 2:21-cv-00037-M, 2024 WL 1337868, at *3 (N.D. Tex. Mar. 28, 2024) (holding "Seller's supply ... refers to the energy that is generated at the relevant [production sources]" and not that which is procured from third parties); *Unit Petroleum*, 2023 WL 4828375, at *1 (treating "gas supply" as that produced by the seller, not gas on the spot market); *Targa Gas Mktg. LLC v. Koch Energy Servs., LLC* [*Targa/Koch I*], No. H-21-1258, 2024 WL 1076839, at *1 (S.D. Tex. Feb. 20, 2024), *report and recommendation adopted,* 2024 WL 1201622 (S.D. Tex. March 20, 2024) (treating defendant's "gas supply" as gas it processed, not spot market gas)).

[33] *Id.* at 723.

[34] *Id.* at 722 (citing Amicus Br. of Marathon Oil Corp. & Targa Gas Mktg. L.L.C., at 7–8).

[35] *Id.*; Base Contract § 11.2.

to fulfill its original delivery obligation, the court held that Pioneer might still owe a duty to purchase spot-market gas as a "reasonable effort."[36] The court thus remanded the case to the trial court for further consideration.[37]

### c. *Marathon I*

¶17    Both before and after *Mieco*, judges in the Southern District of Texas reached similar results in other force-majeure disputes arising under an NAESB form contract in the wake of Winter Storm Uri,[38] most significantly in *Marathon Oil Co. v. Koch Energy Services, LLC* [*Marathon I*].[39] *Marathon I* is a force-majeure

---

[36]*Mieco*, 109 F.4th at 725–27. Importantly, the base contract in *Mieco* included special provisions, not present here, that imposed additional or heightened force-majeure burdens on the seller, including a "due diligence" duty. *Id.* at 726. The *Mieco* court addressed the traditional "reasonable efforts" duty and the added "due diligence" duty together and held that the trial court erred in not reaching that issue after resolving the Section 11.3(v) dispute. *Id.*

[37] *Id.* at 727.

[38] *See Targa/Mieco*, 2023 WL 9546743; *Targa/Koch II*, 2024 WL 5328564. Targa was the seller that invoked force majeure in both of these cases, and in both cases, Targa sought the same summary-judgment ruling: a declaratory judgment that (1) Winter Storm Uri was a force-majeure event within the meaning of the base contract; (2) Targa's failure to supply full contract volumes was caused by force majeure; and (3) Targa had no obligation to purchase replacement gas. *Targa/Mieco*, 2023 WL 9546743, at *4; *Targa/Koch II*, 2024 WL 5328564, at *1. In the first case, decided before the Fifth Circuit's opinion in *Mieco*, the court granted Targa's summary-judgment request, without expressly addressing the "reasonable efforts" issue. *Targa/Mieco*, 2023 WL 9546743, at *6; *see also* Plf.'s Opp. to Def.'s Mot. for Partial Summ. J., *Targa/Mieco*, No. 4:21-cv-01128, 2023 WL 11230109 (S.D.Tex. June 29, 2023) (arguing briefly that Targa had not satisfied its "reasonable efforts" obligation under Section 11.2 because it "could have avoided the adverse impacts of Winter Storm Uri entirely by purchasing widely available gas"). In the second case, decided after *Mieco*, the court declined to grant summary judgment on whether Targa had an obligation to purchase replacement gas, relying on *Mieco* to hold that while Section 11.3(v) did not require Targa to purchase replacement gas to invoke force majeure, purchasing replacement gas could have been necessary as a "reasonable effort" under Section 11.2. *Targa/Koch II*, 2024 WL 5328564, at *5–6. Because the court could not rule out that possibility as a matter of law, it concluded that Targa's requested declaratory relief was "simply too broad." *Id.*

[39] *Marathon I*, 2023 WL 4032879, at *13.

dispute arising out of Winter Storm Uri in which Marathon was the seller claiming force majeure, and the parties were represented by the same law firms that represent the parties here.[40] Consistent with *Mieco*, the *Marathon I* court held that Marathon was not obligated to buy gas on the spot market to fulfill its delivery obligations under the parties' contract,[41] pointing out that otherwise the force-majeure clause would be "essentially meaningless because it would mean that a seller could never invoke force majeure so long as there was some gas available anywhere in the world, at any price."[42] If the existence of a spot market precluded sellers from relying on the force-majeure clause, a well-freezing storm would rarely, if ever, trigger the clause, even though the clause expressly covers regional weather events "such as low temperatures which cause freezing or failure of wells[.]"[43]

¶18    Also consistent with *Mieco*, the court later clarified the scope of its summary-judgment ruling, stating that Koch could not argue that Marathon could

---

[40] *See* Mercuria MSJ at 15. The parties in that case were also represented by counsel that also represent the parties in this case.

[41] *Marathon I*, 2023 WL 4032879, at *13.

[42] *Id.* (quoting *Ergon-West Va., Inc. v. Dynegy Mktg. & Trade*, 706 F.3d 419, 424 n.5 (5th Cir. 2013); also citing *LNG Ams.*, 2023 WL 2920940, at *8); *Mieco, LLC v. Pioneer Nat. Res. USA, Inc.*, No. 3:21-CV-1781-B, 2023 WL 2064723, at *6 (N.D. Tex. Feb. 15, 2023), *aff'd in part and rev'd in part by Mieco*, 109 F.4th 710 (5th Cir. 2024)).

[43] Base Contract § 11.2; *see LNG Ams.*, 2023 WL 2920940, at *8 ("If the existence of a sport market precluded force majeure, a well-freezing storm would never qualify unless all suppliers lost virtually all of their production feeding the [delivery point]."); *Tejas Power Corp.*, 1999 WL 605550, at *3 (holding that if it were to require purchasing replacement gas, "the force majeure clause would be meaningless. So long as gas could be procured anywhere in the world, at any price, [Marathon] would be obliged to meet its contractual obligations.").

not declare force majeure because gas was available for purchase on the spot market but could still "put on the full panoply" of what it considered a "reasonable effort" under Section 11.2.[44]

### d. Applicability of *Virginia Power*, *Mieco*, and *Marathon I* here

¶19    This Court generally agrees with and will follow *Virginia Power, Mieco*, and *Marathon I* with respect to the holdings discussed above. Based on this non-binding but persuasive authority, the Court holds that: (1) the phrase "Seller's Gas supply" in Section 11.3 refers to the gas Marathon had available to satisfy its delivery obligations under the parties' Contract[45] and does not include gas available for purchase on the spot market;[46] (2) Marathon was not required to purchase spot-

---

[44] *Marathon II*, 2025 WL 950085, at *8.

[45] *See Va. Power*, 297 S.W.3d at 407. *Virginia Power* is distinguishable from this case in a notable respect. A key dispute between the parties was over whether "Gas supply" could be limited to certain gas from specific offshore platforms Apache had internally designated as the source for fulfilling the parties' contract but had not designated in any way in the contract documents. As the court pointed out, there was evidence that "[i]f Apache and VPEM wanted to 'path' the gas from specific wellhead(s) to delivery points then that information should have been in the contract, or at least the Transaction Confirmations, and it was not." *Id.* at 406. Here, in contrast, Marathon's transaction confirmation does identify an aspect of its delivery path—"Enable Gathering and Processing"—and the Court has held that both parties' transaction confirmations are part of the parties' Contract. *Mercuria*, 2025 Tex. Bus. 36, ¶ 2, __ S.W.3d at __. Thus, while this Court adopts *Virginia Power*'s interpretation of "Gas supply," the interaction between the meaning of that phrase and the other, different contract language present here may result in a different outcome with respect to what gas is "available" or what the delivery obligation to be satisfied is. In *Marathon I*, for example, the court held that because Marathon designated the Midship pipeline in its transaction confirmation, the base contract did not require Marathon to deliver on any other pipeline as a matter of law. *Marathon I*, 2023 WL 4032879, at *12. Ultimately, this Court need not resolve that issue at this stage.

[46] *See Mieco*, 109 F.4th at 714. The Fifth Circuit left open the possibility that "Seller's Gas supply" could have a different meaning when the seller is a "middleman" rather than a producer. *Id.* at 722. Marathon is not a middleman; it is a producer similar to Pioneer in *Mieco*.

14

market gas to fulfill its original delivery obligation and need not prove that Winter Storm Uri prevented it from doing so to satisfy Section 11.3(v);[47] and (3) in the absence of Special Provision 5, Marathon might still have had a duty to purchase spot-market gas as a "reasonable effort" under Section 11.2.[48] This leaves two key questions for this case: (1) what is the meaning of "alternative Gas supplies," and (2) whether the addition of Special Provision 5 eliminated Marathon's potential duty to purchase spot-market gas as a reasonable effort.

### 2. "Alternative Gas supplies" includes spot-market gas, whether available at the delivery location or elsewhere.

¶20    Having concluded that "<u>Seller's</u> Gas supply" is the gas Marathon had <u>available</u> to satisfy its delivery obligations under the parties' Contract and not spot-market gas, the Court turns to the meaning of "<u>alternative</u> Gas supplies." The Court concludes that "Seller's Gas supply" and "alternative Gas supplies" are two sides of the same coin: "alternative Gas supplies" are gas supplies that could be used to fulfill Marathon's delivery obligation *instead of* or *as a substitute for* the gas that Marathon is excused from delivering by the force-majeure clause—typically, the seller's gas supply. Because spot-market gas is not part of Marathon's gas supply, it is one of the "alternative gas supplies" covered by Special Provision 5.

---

[47] *Id.* at 713; *Marathon I*, 2023 WL 4032879, at *11–13.

[48] *Mieco*, 109 F.4th at 727; *Marathon I*, 2023 WL 4032879, at *13.

¶21    First, "Gas supplies" in Special Provision 5 and "Gas supply" in Section 11.3(v) have a consistent meaning. Absent a contrary indication, there is a "natural presumption" that the same words are intended to have the same meaning throughout a contract.[49] The Contract shows that in both contexts, "Gas supply" refers to gas available to Marathon to satisfy its delivery obligations to Mercuria.[50] "Gas supply" thus includes spot-market gas, though "<u>Seller's</u> Gas supply" does not include spot-market gas because it is not owned by Marathon, the seller.

¶22    Second, because the Contract does not define "alternative," the Court gives that term its ordinary meaning. Along with other, less apropos definitions, contemporary dictionaries generally define the adjective "alternative" as reflecting a choice between two (or more) mutually exclusive options, potentially with the "alternative" option being the one that is a "substitute" for the original or more usual option.[51] The meaning of "alternative Gas supplies" thus necessarily depends on what they are an "alternative" to.

---

[49] *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 126 (Tex. 2015) (quoting rule of statutory interpretation from *Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932), applying rule to contract construction, and noting that rule is "not rigid" and yields when contract text indicates different intent); *see also Farmers Grp., Inc. v. Geter*, 620 S.W.3d 702, 709 (Tex. 2021); *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 736 (Tex. 1990); Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170-173 (2012).

[50] *See Va. Power*, 297 S.W.3d at 407.

[51] *E.g.*, *Alternative*, OXFORD ENGLISH DICTIONARY ("Of two things: Such that one or the other may be chosen, the choice of either involving the rejection of the other"); *Alternative*, DICTIONARY.COM (2024) ("affording a choice of two or more things, propositions, or courses of action," "employing or following nontraditional … methods …"); *Alternative*, COLLINS DICTIONARY (2024), available

¶23    Third, to determine what "alternative Gas supplies" are an alternative to, the Court looks to the textual context in which that phrase appears. Section 11.1 states that "neither party shall be liable to the other for failure to perform … , to the extent such failure was caused by Force Majeure and the party claiming excuse shall have no obligation to seek alternative Gas supplies in order to satisfy any obligation hereunder."[52] Thus, "alternative Gas supplies" is juxtaposed with the gas supply that Marathon would "be liable to [Mercuria] for failure to [deliver]" except "to the extent such failure was caused by Force Majeure."[53] In circumstances like *Virginia Power*, *Mieco*, *Marathon I*, and this case, that is generally the "Seller's Gas supply": the gas supply the seller must show the storm caused to be unavailable to fulfill its delivery obligations under the contract.[54]

¶24    *Mieco* and *Marathon I* foreclose Mercuria's argument that Marathon's original delivery obligation extended to buying gas available on the spot market.[55] Under those holdings, Marathon might have to purchase spot-market gas to fulfill the force-majeure clause's "reasonable efforts" duty, but it did not have to do so to

---

at www.collinsdictionary.com ("An alternative plan or offer is different from the one that you already have, and can be done or used instead"); Free Dictionary ("Substitute or other").

[52] Base Contract § 11.1, Special Provision 5 (emphasis added).

[53] *Id.*

[54] *See Va. Power*, 297 S.W.3d at 407; *Mieco*, 109 F.4th at 724; *Marathon I*, 2023 WL 4032879, at *13.

[55] *Mieco*, 109 F.4th at 713; *Marathon I*, 2023 WL 4032879, at *11–13.

fulfill its original delivery obligations or to rely on the force-majeure provision.[56]

Moreover, as the Fifth Circuit points out, the NAESB drafting committee rejected efforts to revise the force-majeure clause in the form contract to require sellers to buy gas available on the spot market.[57] Mercuria cannot obtain by judicial fiat contract terms it failed to obtain from the NAESB or in negotiations with Marathon.

¶25    Because spot-market gas <u>is not</u> part of the gas supply Marathon was obligated to deliver unless excused by force majeure, it <u>is</u> part of the "alternative Gas supplies" that Marathon "ha[d] no obligation to seek … in order to satisfy any obligation hereunder" pursuant to Special Provision 5.[58]

### 3. Special Provision 5 relieved Marathon of any obligation to obtain spot-market gas as a "reasonable effort" under Section 11.2.

¶26    Under Section 11.2, Marathon has a duty to "make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance."[59] The courts in *Mieco* and *Marathon I* left open the question of whether the seller might have a duty to purchase spot-market gas as such a "reasonable effort."[60] The question here is

---

[56] *Mieco*, 109 F.4th at 727; *Marathon I*, 2023 WL 4032879, at *13.

[57] *Mieco*, 109 F.4th at 722.

[58] Base Contract § 11.1, Special Provision 5.

[59] Base Contract § 11.2.

[60] *Mieco*, 109 F.4th at 727; *Marathon I*, 2023 WL 4032879, at *13.

18

whether the language added by Special Provision 5 eliminates that possibility. The Court concludes that it does.

¶27 Section 11.3(v) does not excuse any party from any contractual duty; it dictates when a party cannot rely on the force-majeure clause—i.e., when a duty is <u>not</u> excused.[61] Thus, in *Virginia Power*, *Mieco*, and *Marathon I*, even if the seller prevailed on its interpretation of Section 11.3, the seller was still subject to whatever duties it owed under Section 11.2's "reasonable efforts" mandate. Special Provision 5, on the other hand, expressly relieves the party claiming force majeure of any "obligation to seek alternative Gas supplies in order to satisfy any obligation hereunder."[62] The question becomes whether this disclaimer extends to any duty to seek spot-market gas under Section 11.2. The Court holds that it does.

¶28 Having already held that Special Provision 5 excuses Marathon from any duty to seek spot-market gas "in order to satisfy any obligation hereunder," the Court easily concludes that "any obligation hereunder" includes any "reasonable efforts" obligation under Section 11.2. The term "hereunder" in a contract typically extends to the whole contract. [63] Even if it does not extend to the whole

---

[61] Base Contract § 11.3.

[62] Base Contract § 11.1, Special Provision 5 (emphasis added).

[63] *Hereunder*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining term to mean "[i]n accordance with this document" or "[l]ater in this document"). In the contractual context, courts have typically interpreted "hereunder to refer to the whole agreement." *See, e.g.*, *Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 692 (8th Cir. 1997) (observing that in contractual context,

contract here, at a minimum, it extends to the obligations imposed in the very next part (Section 11.2) of the very same provision (the force-majeure provision). Thus, under Section 11.1 of the Base Contract, as modified by the parties, Marathon had no duty to seek spot-market gas "in order to satisfy [its] obligation" under Section 11.2 to "make reasonable efforts" to ameliorate Winter Storm Uri's effects.

## B.  Marathon was not obligated to buy back its delivery obligation.

¶29  Mercuria concedes that the Contract did not require Marathon to buy back its delivery obligations in general but argues that there is nevertheless a fact issue as to "[w]hether a buyback under this set of facts constitutes a 'reasonable effort'" under Section 11.2.[64] The Court concludes that the Contract language forecloses such a fact issue.

¶30  First and foremost, Section 11.2's text does not encompass a buyback. Section 11.2 obligates Marathon to "make reasonable efforts [1] to avoid the adverse impacts of a Force Majeure and [2] to resolve the event or occurrence once it

---

"'hereunder' typically signified 'under the agreement'"); *Gregory v. Electro-Mech. Corp.*, 83 F.3d 382, 386 (11th Cir. 1996); *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983); *Int'l Asset Mgmt., Inc. v. Holt*, 487 F. Supp. 2d 1274, 1288 (N.D. Okla. 2007).

[64] A buyback is a purely financial transaction in which one party pays the other to be relieved of its duty to perform under the contract. *See Marathon I*, 2023 WL 4032879, at *14; *Hartree Partners, LP v. Vaquero Permian Processing LLC*, 209 N.Y.S.3d 4, 7 (N.Y. App. Div. 2024). Mercuria describes a "buyback" as "an agreement between counterparties in which one party pays money to the other party in lieu of physically exchanging gas molecules to meet its contractual obligation." Mercuria Resp. to Marathon MSJ at 15.

has occurred in order to resume performance."[65] A buyback would do neither. It would not "avoid the adverse impacts" of Winter Storm Uri; it would merely shift the financial consequences from one party to another. The storm would have had the same impact on Marathon's gas supply, and Marathon would have delivered the same amount of gas to Mercuria. The only difference would be that Marathon paid Mercuria for the gas it did not deliver. It likewise would not "resolve the event or occurrence … in order to resume performance." A buyback does not allow performance to resume; performance does not occur at all under a buyback.

¶31 Second, a buyback duty runs counter to the quintessential purpose of the force-majeure clause and would render it ineffective. By its very nature, a force-majeure clause identifies circumstances in which a nonperforming party will not be liable for failing to perform; instead, the risk of nonperformance is allocated to the other party when the force-majeure criteria are satisfied. A "reasonable efforts" duty requiring the nonperforming party to buy back its performance obligation would shift that risk back to the nonperforming party—undoing the very thing the force-majeure clause does.

¶32 The case law supports this result. The *Marathon I* court addressed the same buyback dispute under similar circumstances and concluded that Marathon

---

[65] Base Contract § 11.2.

had no duty to buy back its delivery obligation.[66] The court pointed out that imposing a duty on a seller to buy back its delivery obligation in the context of force majeure would render the force-majeure provision meaningless: because a buy back is "always possible," force majeure would never excuse a failure to deliver if the seller had a duty to buy back its delivery obligation.[67]

¶33     Moreover, as Marathon points out, Mercuria's own expert, James Arnold, admitted that Marathon was not required to buy back its delivery obligation as a reasonable effort:

> Q.    Are you offering an opinion that Marathon should have done a buyback of the Mercuria gas?
>
> A.    Well, you used the word "should." I'm saying they could have, that would have been a different way to meet that obligation, except buybacks are a little different. I'm not — on it's own, **I wouldn't call it a reasonable effort that you should or could make.** I would say a buyback is an alternative method to perform. ... But you would **– a buyback in itself is not — I would not call that a sole reasonable effort.** I would say that it is a — it's another option — excuse me — another way when you do have other reasonable efforts that would do it. [68]

Mercuria has not cited any controverting evidence on this point.

## Conclusion

¶34     For these reasons and the reasons articulated in Marathon's motion for partial summary judgment, the Court granted summary judgment holding (among

---

[66] *Marathon I*, 2023 WL 4032879, at *14.

[67] *Id.*

[68] James Arnold Dep. 119:15-25, 120:1-6 (July 24, 2025), Exh. 16 to Marathon MSJ.

other things) that the parties' Contract did not obligate Marathon to acquire replacement gas to satisfy its delivery obligation to Mercuria or buy back its delivery obligation from Mercuria as a prerequisite or alternative to declaring force majeure or as a "reasonable effort" under Section 11.2 of the Base Contract.

Date signed: October 14, 2025

_____
Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division, *sitting by assignment
in the Eleventh Division*

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 106846284
Filing Code Description: No Fee Documents
Filing Description: Marathon Motion for Summary Judgment Opinion
Status as of 10/15/2025 8:13 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Timothy C.Shelby | | tshelby@azalaw.com | 10/14/2025 6:49:13 PM | SENT |
| David T. McDowell | | david.mcdowell@mhllp.com | 10/14/2025 6:49:13 PM | SENT |
| Mark Trachtenberg | | mark.trachtenberg@haynesboone.com | 10/14/2025 6:49:13 PM | SENT |
| Sammy Ford | | sford@azalaw.com | 10/14/2025 6:49:13 PM | SENT |
| Valerie Koinis | | vkoinis@azalaw.com | 10/14/2025 6:49:13 PM | SENT |
| Ryan Pitts | | ryan.pitts@haynesboone.com | 10/14/2025 6:49:13 PM | SENT |
| Alejandra Ramos | | aramos@azalaw.com | 10/14/2025 6:49:13 PM | SENT |
| Garrett Martin | | garrett.martin@haynesboone.com | 10/14/2025 6:49:13 PM | SENT |
| Paul Galante | | PGalante@azalaw.com | 10/14/2025 6:49:13 PM | SENT |
| Emily Adler | | eadler@azalaw.com | 10/14/2025 6:49:13 PM | SENT |
| Rachel HBartenfeld | | rachel.bartenfeld@haynesboone.com | 10/14/2025 6:49:13 PM | SENT |
| AZA Service Email Address | | service@azalaw.com | 10/14/2025 6:49:13 PM | SENT |
| Ab Henry | | ahenry@azalaw.com | 10/14/2025 6:49:13 PM | SENT |
| William B.Thomas | | william.thomas@mhllp.com | 10/14/2025 6:49:13 PM | SENT |
| Mary E.Green | | mary.green@mhllp.com | 10/14/2025 6:49:13 PM | SENT |
| William King | | william.king@mhllp.com | 10/14/2025 6:49:13 PM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 10/14/2025 6:49:13 PM | SENT |
| Richard Hood | | richard.hood@mhllp.com | 10/14/2025 6:49:13 PM | SENT |