**TRANSOIL (JERSEY) LTD., Plaintiff–Appellee, Cross–Appellant,**

v.

**BELCHER OIL COMPANY, Defendant–Third Party Plaintiff–Appellant, Cross–Appellee.**

No. 90–2629.

United States Court of Appeals,
Fifth Circuit.

Jan. 16, 1992.

---

Coastal Fuels Marketing, Inc., f/k/a Belcher, Neil O. Bowman, Miami, Fla., James M. McGraw, D. Scott Funk, Looper, Reed, Mark & McGraw, Houston, Tex., for Belcher Oil Co.

Chris A. Lorensen Crain Caton, James & Womble, Houston, Tex., Karen H. Curtis, Edmunt T. Henry, Shutts & Bowen, Miami, Fla., for Transoil.

Before DAVIS and BARKSDALE, Circuit Judges, SCHWARTZ, District Judge:[1]

**W. EUGENE DAVIS, Circuit Judge:**

Appellant Belcher Oil Company (Belcher) appeals from a judgment entered on a jury verdict, awarding Transoil (Jersey) Ltd. (Transoil) $2,062,000 in damages for Belcher's breach of its contract to sell oil to Transoil. In this appeal, Belcher contends that the evidence at trial was insufficient to support the jury's finding that Belcher breached the contract or to justify its calculation of damages. After a careful review of the record, we conclude that the evidence supports the jury's liability finding but does not support any damage award. We therefore reverse and render.

## I.

In January 1986, Belcher entered into a contract with Transoil for the sale of 245,-

---

[1] District Judge of the Eastern District of Louisiana, sitting by designation.

592 barrels of number six oil at a price of $19.40 per barrel. As a part of their agreement, the parties agreed that the oil would meet certain standards and specifications. Critical to this appeal, the contract provided that the level of the element vanadium in the oil would not exceed 200 parts per million (ppm). The parties appointed an independent inspector, E.W. Saybolt & Company (St. Eustatius), N.V. (Saybolt NV), to test the quantity and quality of the oil at the discharge port.

The oil in question was loaded on board the M/V JACINTH at the Port Neches Fina refinery near Houston, Texas and shipped to the Statia Terminals, St. Eustatius, Netherlands Antilles. Prior to shipping, Belcher hired an inspector other than Saybolt NV to test the quality of the oil at the load port. According to these test results, the oil contained 181 ppm of vanadium.

The M/V JACINTH arrived at St. Eustatius on January 18, 1986 and off-loaded the oil into a shore tank. During the off-loading, Saybolt NV took samples of the oil from the ship's various compartments and made a composite sample. Statia Labs, an affiliate of Transoil, tested the sample later that day in the presence of Saybolt NV representatives. Saybolt NV subsequently issued a "Report of Witnessed Analysis," verifying that Statia Labs' tests had determined the oil's vanadium content to be 257 ppm. The report indicated, however, that Saybolt NV did not verify the accuracy of the tests.

After the first discharge port test showed that the oil had excessive vanadium, the parties initiated a series of retests. Transoil had Statia Labs retest its composite sample and also a shore tank sample. Later that week, E.W. Saybolt, Inc. of Kenilworth, New Jersey (Saybolt–Kenilworth) and E.W. Saybolt, Inc. of Pasadena, Texas (Saybolt–Pasadena) also tested discharge port samples in their respective labs. In February 1986, Belcher commissioned SGS laboratories to test samples from the shore tank. Finally, in March 1986, at Transoil's request, Saybolt–Pasadena retested the shore tank samples using the IP–288 method. All of these retests, except the first Saybolt–Pasadena tests, concluded that the oil's vanadium content exceeded 200 ppm.

While the parties were having the oil retested, they also attempted to negotiate a settlement. On January 23, 1986, Transoil sent Belcher a telex proposing a $284,-641.13 reduction in the contract price. Transoil indicated that it would use the difference to purchase oil with a low vanadium content to dilute the oil and thus bring it within specification. When negotiations on this proposal did not produce an agreement, Transoil sent Belcher a telex rejecting the oil on January 27th. Literally minutes later, Belcher accepted Transoil's offer to correct the oil. Despite its earlier rejection, Transoil sent Belcher a telex two days later offering to accept $284,641.13 plus $1.50 a barrel to correct the quality problem. Belcher did not respond to this offer.

Coincidentally, after January 20, 1986, while Belcher and Transoil negotiated, the world spot market price of oil began to fall. Despite this development, the parties could not agree on the correct test results or a proper settlement. As a result, Transoil brought suit in a Swiss court in February 1986 to block payment of its letter of credit, issued by a Swiss bank. The Swiss court granted Transoil a temporary restraining order but later dissolved it, denying Transoil's application for a temporary injunction. On February 26, 1986, the Swiss bank paid Belcher's invoice under the letter of credit.

Thereafter, on March 13, 1986, Transoil resold the oil to Statia Terminals for $11 a barrel. From January 19, 1986 to March 13, 1986, the market value of number six oil had fallen from $20 a barrel to $12.25 a barrel.

In April 1986, Transoil brought suit against Belcher for breach of contract. Following a full trial on the merits, the jury found that Belcher had breached its contract by furnishing off-spec oil and awarded Transoil $2,062,000 in damages. The court denied Belcher's motions for judgment notwithstanding the verdict and

new trial, and Belcher lodged this timely appeal.

## II.

Belcher argues first that the evidence is insufficient to support the jury's determination that Belcher breached its contract with Transoil.

To reverse the district court's denial of Belcher's motion for judgment notwithstanding the verdict, we must be satisfied that the facts and inferences point so strongly in favor of Belcher that reasonable jurors could not reach a contrary verdict. *See Boeing Co. v. Shipman,* 411 F.2d 365, 374-75 (5th Cir.1969). If, however, substantial evidence supports the jury's finding, we must affirm the district court's denial of Belcher's motion. Substantial evidence is "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.*

In reviewing the district court's denial of Belcher's motion for a new trial, on the other hand, we must determine whether the court's ruling is an "abuse of discretion," that is, "clear error." *Eyre v. McDonough Power Equipment, Inc.,* 755 F.2d 416, 420 (5th Cir.1985). A district court abuses its discretion, in denying a motion for a new trial, if there is an "absolute absence" of evidence to support the jury's verdict. *United States v. An Article of Drug Consisting of 4,680 Pails,* 725 F.2d 976, 990 (5th Cir.1984).

Belcher argues that the jury was not entitled to find that the oil was off-spec because the tests, on which Transoil relies, were not certified by Saybolt NV and did not meet the contract's requirements. We disagree. The contract provides that:

> [I]f either party desires an independent petroleum inspector present at the time of delivery, such inspector shall be appointed jointly, and the cost of his services shall be shared equally by the parties. The inspectors [sic] determinations shall be conclusive and binding upon both parties.

This provision does not require Saybolt NV to "certify" or perform, rather than witness, the testing.

When the oil arrived on St. Eustatius, Saybolt NV collected samples, delivered them to the lab for testing, and then witnessed Statia Labs perform the tests. Once Statia Labs had compiled the results, Saybolt NV issued a "Record of Witnessed Analysis," verifying the results but not their accuracy. The record reflects that this witnessed analysis was Saybolt NV's usual practice and the usual procedure for the Caribbean. The jury was entitled to find that Saybolt NV could not have performed the tests itself because Statia Labs operated the only testing facilities on the island.

In addition, Transoil presented evidence that Belcher knew that Saybolt NV would not actually run the tests in the Caribbean. Several months before this transaction, Belcher had accepted a witnessed analysis from another Saybolt company as dispositive of a Caribbean cargo's quality. Transoil also presented the deposition testimony of a Saybolt NV employee who had advised Belcher that Saybolt NV would only be providing a witnessed analysis and would not be running the tests.

Belcher argues that, regardless, Statia Labs did not conduct the discharge port tests in accordance with the contract's requirements. The contract required that testing of the quantity and quality of the oil be:

> in accordance with standard test methods specified in the official publications of either the American Society for Testing and Materials (ASTM) or the Institute of Petroleum (IP), whichever are in general use at the discharge terminal. Other appropriate test methods may be used for the qualities where no methods are prescribed in ASTM or IP publications on the date of this Agreement.

In general, St. Eustatius followed the ASTM's standards. However, the ASTM publications no longer prescribed the ASTM D-2788 test, used by Statia Labs. In fact, of all the tests conducted, only the March 1986 Saybolt-Pasadena test fol-

lowed a prescribed method, IP–288, although others used methods similar to the ASTM/IP methods.

Nevertheless, the jury was entitled to find that the vanadium test, conducted by Statia Labs and witnessed by Saybolt NV, substantially complied with the contract. Transoil's experts testified that this test was the "technical equivalent" of the IP–288 test. Significantly, the jury heard the results from five non–IP–288 tests and one IP–288 test that revealed that the oil's vanadium exceeded 200 ppm. Curiously, despite Belcher's emphasis on the importance of the standards required by the contract, neither of the two tests on which it has relied followed those methods.

Thus, the jury had "substantial evidence" that Belcher breached the contract by shipping off-spec oil to Transoil. Consequently, the district court correctly denied Belcher's motion for judgment notwithstanding the verdict on the liability issue. Furthermore, the same evidence demonstrates that the district court did not abuse its discretion in denying the motion for a new trial because there was not an "absolute absence" of evidence to support the jury's verdict.

### III.

The more difficult question we face is whether the jury properly calculated Transoil's damages. Belcher argues that the award is unsupported by the evidence under the legal theory upon which the case was tried and submitted to the jury. We agree.

The judge instructed the jury that if it found that Belcher breached the contract it must determine whether the breach caused Transoil any damages. On the question of damages, the judge instructed the jury that:

> In general, the applicable Texas law provides damages for breach in the amount of the expectancy interest of the

wronged party. In other words, the award of damages is intended to place the victim of the breach in the same position he would have occupied had the breach not occurred.

> You are instructed that the term expectancy damage means the general difference in value losses—the difference in value to the wronged party of the goods delivered and the goods as promised under the contract.

> You are further instructed that the contract between Transoil and Belcher excludes any additional consequential or incidental damages, including, but not limited to interest, and further excludes any damages because of any particular purpose which Transoil may have had for the goods delivered.

The jury awarded Transoil $2,062,000 in damages.

In this appeal, Transoil and Belcher do not dispute the correctness of the charge, only the proper construction of it. Belcher contends that the judge gave this instruction pursuant to § 2.714(a) of the Texas Uniform Commercial Code (U.C.C.), which governs the remedies available to a buyer who has *accepted* nonconforming goods.[2] Belcher argues that Transoil, having accepted the oil, could only seek the difference in value between the oil as promised and as delivered. According to Belcher, under the charge, the proper calculation of damages is the difference between the contract price, i.e., the value as promised, and the market price on the date of tender, i.e., the value as delivered. Belcher maintains that the contract price ($19.40/barrel) represents the value of the oil as promised and that the spot market oil price ($20/barrel) represents the value as delivered.

According to Transoil, the judge gave a general charge, justified under several U.C.C. sections. Transoil argues that the award is proper not only under §§ 2.714(a)

---

**2.** Section 2.714(a) provides:
Where the buyer has accepted goods and given notification (Subsection (c) of Section 2.607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
V.T.C.A., Bus. & C. § 2.714(a).

and (b)[3] when the case is viewed as involving a "forced acceptance" of the oil but also under § 2.711 when the case is viewed as involving a "rejection" or "revocation of acceptance" of the oil.[4] Transoil contends that the proper calculation of damages, in light of these sections, is the difference between the contract price, i.e., value as promised, and the resale price, which Transoil contends is equivalent to the value as delivered.

■ We need not consider the merits of Transoil's argument under § 2.711 because Transoil failed to request an instruction pursuant to this section from the district court. Transoil had the burden of requesting instructions necessary to set out its theory of the case to the jury. *Cf. Farrar v. Cain*, 756 F.2d 1148, 1150–51 (5th Cir. 1985) (failure to object to the jury charge in the trial court precludes appellate review unless the error results in a miscarriage of justice); *Fisher v. Indiana Lumbermens Mutual Insurance Co.*, 456 F.2d 1396, 1400 (5th Cir.1972) (failure to submit a specific instruction to the trial court bars subsequent appellate complaint that the court did not give the requested instruction); 5A James W. Moore et al., *Moore's Federal Practice* ¶¶ 51.03, 51.04 (2d ed.1991). Transoil did not request, or object to the omission of, an instruction on "rejection," "revocation of acceptance," or "forced acceptance." Thus, even though Transoil argued facts that suggest rejection and revocation of acceptance as grounds for recovery, the jury never had these legal theories before it.

■ Under the Texas Uniform Commercial Code, an acceptance theory of recovery is distinct from a rejection or revocation of acceptance theory. A party claiming that it rightfully rejected nonconforming goods must demonstrate that it rejected the goods within a reasonable time following delivery and seasonably notified the seller. V.T.C.A., Bus. & C. § 2.602(a). Revocation of acceptance, on the other hand, requires proof of:

> (1) initial acceptance (with a reasonable assumption that the non-conforming item would be cured and it is not cured, or without discovery of the non-conforming item if acceptance was induced by difficulty of discovery or by seller's assurance); (2) of non-conforming item; (3) such non-conformity substantially impairs value to the buyer; (4) and revocation occurs within a reasonable time; (5) in any event, the revocation must occur before a substantial change in the condition of the good occurs (which change is not caused by defect of the goods).

*Neily v. Aaron*, 724 S.W.2d 908, 913–14 (Tex.App.—Fort Worth 1987, no writ). *See also* V.T.C.A., Bus. & C. § 2.608. Proof that a party availed itself of one of these two remedies is necessary to permit recovery under § 2.711.

■ The judge's charge, however, did not instruct the jury to consider any of the elements of either rejection or revocation

---

**3.** Section 2.714(b) provides:
> The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

V.T.C.A., Bus. & C. § 2.714(b).

**4.** Section 2.711 provides, in part:
> (a) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2.612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid

> (1) "cover" and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or
> (2) recover damages for non-delivery as provided in this chapter (Section 2.713)

> \* \* \* \* \* \*

> (c) On rightful rejection or justifiable revocation of acceptance a buyer has a security interest in goods in his possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care and custody and may hold such goods and resell them in like manner as an aggrieved seller (Section 2.706).

V.T.C.A., Bus. & C. § 2.711.

of acceptance. Also, as noted above, Transoil never requested an instruction on these elements, nor did it object to their omission from the charge. Consequently, Transoil cannot now claim that the jury awarded damages under either of these legal theories because the judge never presented them to the jury.

The district court's damage charge is based, instead, in large part on language taken from *Reynolds Metals Co. v. Westinghouse Elec. Corp.,* 758 F.2d 1073 (5th Cir.1985). In that case, the plaintiff buyer proceeded against the defendant seller on the theory that the buyer sustained damages when it accepted nonconforming goods. We explained that the expectancy damages the buyer was generally entitled to recover consisted of three principal components:

> (1) general difference-in-value losses— the difference in value to the wronged party of the performance or goods tendered and the performance or goods as promised under the contract; (2) incidental losses—costs incurred in a reasonable effort, whether successful or not, to avoid losses caused by the breach; and (3) consequential losses—items such as lost profits or injuries to person or property foreseeably caused by the breach. *See, e.g.,* Tex.Bus. & Com.Code §§ 2.713, 2.714 (Vernon 1968); Restatement (Second) of Contracts § 347 (1979).

*Id.* at 1079.

As in *Reynolds,* the contract in today's case excludes recovery of incidental and consequential losses. The district court, therefore, correctly instructed the jury that it could only award difference-in-value losses. Thus, under the charge, Transoil was entitled to recover for any diminution in the oil's value resulting from the oil's nonconformity, that is, its excessive vanadium content. *See Micromedia v. Automated Broadcast Controls,* 799 F.2d 230, 235–36 (5th Cir.1986). We conclude, therefore, that the only legal theory before the jury assumed an acceptance of nonconforming goods, permitting recovery under § 2.714. We next consider whether § 2.714 supports the jury's award.

Transoil argues that even under § 2.714 the award is supported by the record evidence and is reasonable. Transoil maintained, throughout the trial and on appeal, that the proper calculation of damages is the difference between the oil's promised value ($19.40/barrel) and its resale value ($11/barrel) after the market drop. Transoil contends that the judge's instruction correctly allowed the jury to award the difference between the contract price and the resale price. In fact, the jury's award of $2,062,000 corresponds almost exactly to this difference, $8.40, multiplied by the number of barrels of oil sold, 245,592.

In some situations, the resale price may accurately reflect the value of the goods on the date of delivery and, therefore, may be used in calculating difference-in-value losses. *See, e.g., GNP Commodities, Inc. v. Walsh Heffernan Co.,* 95 Ill.App.3d 966, 51 Ill.Dec. 245, 420 N.E.2d 659 (1981); James J. White and Robert S. Summers, *Uniform Commercial Code* § 10–2 (3d ed. 1988). In this case, however, the resale price is not an appropriate substitute for the oil's value on the date of delivery because in the interim between the delivery and the resale the spot market price of oil fell by nearly $8. *See* Exhibit 335. Thus, the only significance the jury was entitled to attach to the difference between the contract price and the resale price is the change in value of number six oil on the world market. This price spread does not reflect the difference in value of number six oil with a vanadium content below 200 ppm and the value of the same oil with a vanadium content above that level.

If Transoil had resold the oil before January 21, when the market began to collapse, the resale price would have been evidence of the value of the oil on delivery. Moreover, if that resale price was less than $19.40, the jury could have considered whether that difference in prices was a result of the excess vanadium. However, Transoil did not resell the oil until the market collapsed. While Transoil is entitled to any damages it suffered because of the excess vanadium, Transoil introduced no evidence to demonstrate that the $8.40

difference in the resale price is attributable to the higher vanadium content as opposed to the market's collapse.

In the absence of any proof that the oil sold at a lower price because of its vanadium content, we must conclude that the market's collapse produced the lower resale price. In fact, the expert testimony at trial established that, at the time of delivery, Transoil could have resold the oil at or near the spot market price in several markets even with a vanadium level greater than 200 ppm. Transoil's witnesses testified that the vanadium content affected the value of the oil to Transoil, but they did not say that the excess vanadium altered the oil's value on the open market.

Ordinarily, Transoil could have argued that as a result of the nonconformity it lost its contracts for the sale of the oil. However, as the judge instructed the jury, this contract specifically excluded recovery of such damages. Thus, in order for Transoil to recover, Transoil had to establish that the excess vanadium prevented it from reselling the oil at the prevailing market price. Transoil produced no such evidence.

In fact, the only record evidence relevant to the oil's value, on the date Belcher delivered it, is the Platt's Oilgram price reports. *See* Exhibit 335. According to this index of oil prices, on January 18, 1986, the price of number six oil was $20, which is higher than the contract price. Transoil has not demonstrated that it suffered any damages due to the excess vanadium because some markets would have accepted oil with a vanadium level of more than 200 ppm. Instead, the record reflects that Transoil could have resold the oil, in certain markets, at a price higher than it paid for the oil.

In summary, the evidence presented does not support the jury's award under the legal theory on which the case was submitted to the jury. While it is true that Transoil requested several different damage instructions, none of these instructions supports recovery. The fact that Transoil now points to a theory of recovery for which the evidence might support recovery is of no moment. Transoil failed to ask the district court to present this theory to the jury and, the jury did not consider the evidence under this theory. We cannot say what findings the jury would have made on the plaintiff's claims under such a theory. Therefore, we cannot sustain the judgment on this theory.

## IV.

Having determined that the jury's award of damages to Transoil is not supported by the record, we need not address Belcher's remaining arguments.

For the above reasons we reverse the judgment of the district court and render a take nothing judgment in favor of Belcher.

**REVERSED AND RENDERED.**