2025 Tex. Bus. 40



**The Business Court of Texas,
11th Division**

| | | |
|---|---|---|
| MARATHON OIL CO., | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Cause No. 25-BC11A-0013 |
| MERCURIA ENERGY AMERICA, | § | |
| LLC, | § | |
| | § | |
| *Defendant.* | § | |

═══════════════════════════════════════════

**MEMORANDUM OPINION AND ORDER**

═══════════════════════════════════════════

¶1     Pursuant to Texas Rule of Civil Procedure 166(g),[1] the Court issues this decision holding that (1) fact issues preclude the Court from determining whether the liquidated-damages clause in the parties' contract is an unenforceable penalty and (2) under the circumstances of this case, the defendant's cost-basis theory is not the correct measure of the plaintiff's actual damages.

---

[1] TEX. R. CIV. P. 166(g); *see also Skeels v. Suder*, 671 S.W.3d 664, 670 (Tex. 2023); *JPMorgan Chase Bank, N.A. v. Orca Assets G.P.*, 546 S.W.3d 648, 653 (Tex. 2018).

## Introduction

¶2      This dispute arises out of Marathon's declaration of force majeure in February 2021 under its natural-gas contract with Mercuria.[2] The parties' contract is based on a form North American Energy Standards Board (NAESB) Base Contract for Sale and Purchase of Natural Gas.[3] Section 3.2 of the form allows parties to choose between two alternative remedy provisions: "Cover Standard" or "Spot Price Standard." Marathon and Mercuria selected the Spot Price Standard.[4] Under this standard, if Marathon breached its delivery obligations, as Mercuria asserts, Mercuria's "sole and exclusive remedy" is:

> payment … in an amount equal to the difference between the Contract Quantity and the actual quantity delivered by Seller and received by Buyer for such Day(s), multiplied by the positive difference, if any, obtained by subtracting the Contract Price from the Spot Price[.][5]

¶3      The question before the Court is whether this clause is unenforceable here because there is an "unbridgeable discrepancy" between the damages under this clause (spot-price damages) and Mercuria's actual damages. The Court holds that neither party has conclusively proven the amount of either spot-price or actual

---

[2] The background facts are well known to the parties and summarized in this Court's prior opinions in this case. *See Marathon Oil Co. v. Mercuria Energy Am., LLC*, No. 25-BC11A-0013, 2025 Tex. Bus. 39, ¶ 2, ___ S.W.3d ___, ___ (11th Div. Oct. 14, 2025); *Marathon Oil Co. v. Mercuria Energy Am., LLC*, 2025 Tex. Bus. 36, ¶¶ 3–5, ___ S.W.3d ___, ___ (11th Div. Sept. 18, 2025).

[3] As noted in prior opinions in this case, the parties agreed to Special Exceptions that modified the NAESB form in several aspects. They did not, however, modify Section 3.2, at issue here.

[4] Base Contract p. 2 & § 3.2.

[5] *Id.*

damages, such that it cannot decide this question as a matter of law. But the Court can shed light on the correct measure of Mercuria's actual damages and holds that Marathon's cost-basis theory of actual damages is legally incorrect because it does not reflect the direct, actual economic harm to Mercuria at the time of breach.[6]

## Analysis

### A. Section 3.2 is enforceable unless there is an "unbridgeable discrepancy" between spot-price damages under that section and Mercuria's actual damages.

¶4    The parties agree that the "Spot Price Standard" in Section 3.2 of the parties' contract is a liquidated-damages provision.[7] Consistent with Texas's strong public policy in favor of freedom of contract,[8] liquidated-damages provisions are generally enforceable.[9] But they are constrained by the "universal" rule that limits damages to "just compensation for the loss or damage actually sustained."[10] Under

---

[6] The parties initially asked the Court to decide "[w]hether Section 3.2 of the Base Contract (Spot Price Standard) operates as an unenforceable penalty in these circumstances." Joint Advisory on Early Legal Issues, ¶ 12 (7/25/2025). In their pretrial filings, the parties again identified enforceability as an issue that could be decided by the Court before trial and added a related issue: "the proper measure of Mercuria's actual damages"—an issue that also arose in a discovery dispute between the parties. Joint Pretrial Report at 4 (10/13/2025); Stipulation (10/8/2025), ¶ 1.

[7] *See* Marathon's Tr. Br. on Unenforceable Penalty (8/13/2025) (hereafter, Marathon's Br.); Mercuria's Br. Regarding the Enforceable Spot Price Standard (8/13/2025) (hereafter, Mercuria's Br.).

[8] *Atrium Med. Ctr., LP v. Hous. Red C LLC*, 595 S.W.3d 188, 192 (Tex. 2020) ("Texas favors freedom of contract, as a policy 'firmly embedded in our jurisprudence.'" (quoting *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016))).

[9] *Bonsmara Nat. Beef Co., LLC v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d 385, 397 n.23 (Tex. 2020): "[A] liquidated damages clause is generally as enforceable as any other contractual provision." (citing *Kothe & R.C. Taylor Tr.*, 280 U.S. 224, 226 (1930); *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 767 (Tex. 2005)).

[10] *Atrium Med.*, 595 S.W.3d at 192 (quoting *Stewart v. Basey*, 150 Tex. 666, 245 S.W.2d 484, 486 (1952)).

this rule, liquidated damages cannot operate as a penalty—whether by design or as applied—rather than a reasonable forecast of damages.[11] Thus, a court applying a liquidated-damages clause must ensure three criteria are satisfied: (1) the harm to be remedied is difficult or impossible to quantify or estimate, (2) the liquidated damages reasonably forecast just compensation for the harm, and (3) there is not an "unbridgeable discrepancy" between liquidated damages and the actual damages.[12] Marathon challenges only the third prong: whether the "Spot Price Standard" in Section 3.2 is unenforceable because the gap between spot-price damages and actual damages is simply too great. Marathon bears the burden of proof on this issue, which is determined at the time of breach.[13]

**B.      The parties agree on several components of their damages calculations.**

¶5      The parties do not agree on either side of unenforceability comparison: actual damages versus liquidated (spot-price) damages. But they agree on several components. First, they stipulate to the dates and amounts of Marathon's delivery shortfalls, which total **136,000 MMBtu**:[14]

---

[11] *Id.*; *FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*, 426 S.W.3d 59, 69 (Tex. 2014).

[12] *Atrium Med.*, 595 S.W.3d at 190, 192–93 (quoting *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991), and *FPL Energy*, 426 S.W.3d at 72).

[13] *Atrium Med.*, 595 S.W.3d at 192–93, 196; *FPL Energy*, 426 S.W.3d at 69–70, 72.

[14] Joint Pretrial Report and Proposed Pretrial Order (10/13/2025), Part III (hereafter, Stipulated Facts), ¶ 9; *see also* Stipulation, ¶ 1.

| Marathon Delivery Shortfalls | |
|---|---|
| **Date** | **Quantity** |
| Feb. 13 | 8,900 MMBtu |
| Feb. 14 | 8,900 MMBtu |
| Feb. 15 | 14,700 MMBtu |
| Feb. 16 | 14,700 MMBtu |
| Feb. 17 | 20,000 MMBtu |
| Feb. 18 | 20,000 MMBtu |
| Feb. 19 | 20,000 MMBtu |
| Feb. 20 | 14,400 MMBtu |
| Feb. 21 | 14,400 MMBtu |
| **Total:** | **136,000 MMBtu** |

¶6    They also agree that the contract price is "Inside FERC PEPL Texas, Oklahoma + $0.035,"[15] and that the "Inside FERC PEPL Texas, Oklahoma" price for February 2021 was $2.575,[16] which results in a total price of **$2.61**, including the $0.035 premium. Thus, if Marathon had performed under the contract, Mercuria would have been obligated to pay Marathon **$354,960** (136,000 MMBtu x $2.61) under the contract.

¶7    The parties agree that Mercuria did not purchase replacement gas when Marathon failed to deliver; instead, Mercuria replaced it with gas Mercuria had in

---

[15] Stipulated Facts, ¶ 5.

[16] The parties have stipulated to the *Platts Gas Daily Midpoint* daily index prices for PEPL Texas, Oklahoma, *id.* at ¶ 11, which the Court understands that to be different from the Inside FERC index for PEPL Texas, Oklahoma (a monthly, rather than daily, price). Marathon's Proposed Findings of Fact and Conclusions of Law at ¶ 46; Mercuria's Proposed Findings of Fact and Conclusions of Law at ¶ 84. Mercuria refers to $2.575 as the "Contract Price" in its damages calculations but also accounts for the $0.0350 premium separately. *See* Mercuria's Fifth Supplemental Initial Disclosures at 5.

storage.[17] To resolve a discovery dispute, the parties filed a stipulation agreeing that Mercuria's cost of acquiring the stored gas was "no more than **$2** per MMBtu," which includes "acquisition costs and applicable storage and transportation fees."[18] Under this stipulation, Mercuria's cost basis for the stored gas it used to replace the undelivered gas is **$272,000**:[19]

| Mercuria's Stored-Gas Cost Basis | | | |
|---|---|---|---|
| | **Quantity** | **x Cost** | **= Cost Basis** |
| Feb. 13 | 8,900 MMBtu | x $2.00 | = $17,800 |
| Feb. 14 | 8,900 MMBtu | x $2.00 | = $17,800 |
| Feb. 15 | 14,700 MMBtu | x $2.00 | = $29,400 |
| Feb. 16 | 14,700 MMBtu | x $2.00 | = $29,400 |
| Feb. 17 | 20,000 MMBtu | x $2.00 | = $40,000 |
| Feb. 18 | 20,000 MMBtu | x $2.00 | = $40,000 |
| Feb. 19 | 20,000 MMBtu | x $2.00 | = $40,000 |
| Feb. 20 | 14,400 MMBtu | x $2.00 | = $28,800 |
| Feb. 21 | 14,400 MMBtu | x $2.00 | = $28,800 |
| | | **Total:** | **$272,000** |

## C. The Court cannot determine whether there is an "unbridgeable discrepancy" because neither spot-price nor actual damages have been conclusively proven.

¶8     Whether a liquidated damages provision is an unenforceable penalty is a legal question, but its resolution may depend on certain fact findings.[20] To decide

---

[17] Stipulation, ¶ 4.

[18] Stipulation, ¶ 3.

[19] *Id.*

[20] *Atrium Med.*, 595 S.W.3d at 195; *BMB Dining Servs. (Willowbrook), Inc. v. Willowbrook I Shopping Ctr. L.L.C.*, No. 01-19-00306-CV, 2021 WL 2231258, at *5 (Tex. App.—Houston [1st Dist.] June 3, 2021, no pet.).

whether there is an "unbridgeable discrepancy" between spot-price damages under Section 3.2 and Mercuria's actual damages, the Court must determine what those amounts are—matters the parties dispute. Marathon calculates Mercuria's actual damages as $0 and compares that amount against Mercuria's requested spot-price damages of $26.5 million—a number that Marathon argues is wrong. Mercuria uses identical calculations for its actual and spot-price damages such that there would be no discrepancy at all.

¶9     The Court holds that neither party has conclusively proven the amount of spot-price or actual damages; therefore, fact issues prevent a pretrial resolution of the enforceability issue. Marathon has offered no argument or evidence as to what it contends is the correct amount of Mercuria's spot-price damages, and the Court holds that Marathon's cost-basis model is not the correct legal measure of actual damages under the circumstances of this case. Marathon thus has not met its burden of proving unenforceability as a matter of law. Mercuria, which does not bear the burden of proof on this enforceability issue but will bear the burden of proving its damages at trial, likewise has not established its actual or spot-price damages as a matter of law. Because the Court cannot determine either liquidated damages under the Contract's spot-price formula or actual damages as a matter of law, it likewise cannot determine whether the liquidated-damages clause is enforceable at this time.

### 1. The parties have not conclusively proven the spot price.

¶10   When, as here, the spot-price exceeds the contract price, Section 3.2's spot-price formula can be stated as the quantity delta ("the difference between the Contract Quantity and the actual quantity delivered") multiplied by the price delta ("the positive difference, if any, obtained by subtracting the Contract Price from the Spot Price"):[21]

| Spot-Price Standard | | |
| :---: | :---: | :---: |
| **Quantity Delta** | **x** | **Price Delta** |
| (contract quantity – actual quantity) | x | (spot price – contract price) |

¶11   As noted above, the quantity delta is 136,000 MMBtu and the contract price is $2.61. But the parties disagree about how to calculate the "spot price" price variable and thus dispute the price delta for each day and the total spot-price damages. The parties' contract defines the "Spot Price" as "the price listed in the [Gas Daily Midpoint], under the listing applicable to the geographic location closest in proximity to the Delivery Point(s) for the relevant Day; provided, if there is no single price published for such location for such Day, but there is published a range of prices, then the Spot Price shall be the average of such high and low prices."[22]

---

[21] Base Contract § 3.2.

[22] Base Contract § 2.31. The definition refers to the "publication indicated in the Base Contract," and the parties checked the box for "Gas Daily Midpoint" in their Base Contract. *Id.* § 2.31 & p. 2.

¶12    Mercuria originally invoiced Marathon for just under $17.5 million, calculated based on the undisputed delivery shortfalls and the following pricing:[23]

| Mercuria's Original Invoice | | | | |
|---|---|---|---|---|
| | Quantity | x | Price | |
| Feb. 13 | 8,900 MMBtu | x | $251.51 | = $2,238,439.00 |
| Feb. 14 | 8,900 MMBtu | x | $251.51 | = $2,238,439.00 |
| Feb. 15 | 14,700 MMBtu | x | $251.51 | = $3,697,197.00 |
| Feb. 16 | 14,700 MMBtu | x | $251.51 | = $3,697,197.00 |
| Feb. 17 | 20,000 MMBtu | x | $170.634 | = $3,412,680.00 |
| Feb. 18 | 20,000 MMBtu | x | $62.999 | = $1,259,980.00 |
| Feb. 19 | 20,000 MMBtu | x | $39.394 | = $787,880.00 |
| Feb. 20 | 14,400 MMBtu | x | $3.309 | = $47,649.60 |
| Feb. 21 | 14,400 MMBtu | x | $3.309 | = $47,649.60 |
| | | | Total: | $17,427,111.20 |

The Court is uncertain of the source of these prices, and Mercuria does not address its invoice in its briefing. Marathon says the invoice is based on spot prices at the "West Transfer Delivery Point."[24]

¶13    Later, Mercuria increased its damages calculation by more than $9 million, to just over $26.5 million.[25] Mercuria calculated this amount by multiplying the agreed shortfall quantities by the price deltas below, which it calculated by

---

[23] Marathon Br. at Exhibit 6 (Mercuria Invoice).

[24] Marathon's Br. at 15; *see also id.* at 6.

[25] Marathon's Br. at Exhibits 7–8.

subtracting the total contract price ($2.61) from the average of daily price indices for five different locations around the delivery point:[26]

| Mercuria's Spot-Price Calculation | | | | |
|---|---|---|---|---|
| | **Quantity** | **x Price** | **= Total** | |
| Feb. 13 | 8,900 MMBtu | x $265.888 | = $2,366,403.20 | |
| Feb. 14 | 8,900 MMBtu | x $265.888 | = $2,366,403.20 | |
| Feb. 15 | 14,700 MMBtu | x $265.888 | = $3,908,553.60 | |
| Feb. 16 | 14,700 MMBtu | x $265.888 | = $3,908,553.60 | |
| Feb. 17 | 20,000 MMBtu | x $432.972 | = $8,659,440.00 | |
| Feb. 18 | 20,000 MMBtu | x $259.077 | = $5,181.540.00 | |
| Feb. 19 | 20,000 MMBtu | x $5.469 | = $109,380.00 | |
| Feb. 20 | 14,400 MMBtu | x $1.442 | = $20,764.80 | |
| Feb. 21 | 14,400 MMBtu | x $1.442 | = $20,764.80 | |
| | | | **Total:** | **$26,541,803.20** |

Neither the average nor any of the spot prices in any of these five locations match the spot prices used in Mercuria's original invoice.[27]

¶14    Marathon argues that Mercuria's calculation of spot-price damages is wrong, asserting that Mercuria "created a fake index at which gas would *never* be sold upon withdrawal" and "distort[s] the relevant Spot Price index to artificially inflate its damages."[28] But Marathon does not offer its own calculation or otherwise

---

[26] Marathon's Br. at Exhibits 7–8. These price deltas are not explicitly stated in the damages calculation but can be calculated by dividing the stated sum by the stated quantity delta or by subtracting $2.61 from the indices averages used to calculate the spot price. For example, Mercuria calculated the average spot price for February 13 as $268.498. Subtracting $2.61 from this amount results in a difference of $265.888, the asserted price delta for Feb. 13. Multiplying $265.888 by 8,900 MMBtu (the agreed quantity delta for Feb. 13) results in a product of $2,366,403.20 (the damages asserted by Mercuria for Feb. 13).

[27] *Compare* Marathon Br. at Exhibit 6, *with* Marathon's Br. at Exhibits 7–8.

[28] Marathon's Br. at 15.

say what the correct spot-price damages are. Mercuria's briefing does not address Marathon's complaints or offer arguments or evidence as to why the variables it used to calculate the spot-price are correct.[29] At this stage, the parties have not yet offered evidence about which geographic location is closest in proximity to the West Pool,[30] whether there is a single price publication for such location, or what published range of prices should be used, if any. Under these circumstances, the Court cannot determine the amount of the spot-price damages as a matter of law.

### 2. The parties have not conclusively proven Mercuria's "actual damages."

¶15    "[T]o show that a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for, a defendant may be required to prove what the actual damages were."[31] Marathon has not done so. Although Marathon has proven the amount owed under its cost-basis theory of actual damages, the Court holds that is not the correct measure of

---

[29] This is understandable, as Mercuria does not bear the burden of proof on unenforceability, which was the issue the parties had asked the Court to decide at the time of briefing. It was not until the pretrial filings that the parties asked the Court to also decide "the proper measure of Mercuria's actual damages." Joint Pretrial Advisory at 4.

[30] In another case involving the same contract provision and lawyers and one of the parties here, the parties disputed the meaning of the phrase "geographic location closest in proximity to [the delivery point]" in the definition of "Spot Price." *Marathon Oil Co. v. Koch Energy Servs., LLC*, No. CV H-21-1262, 2025 WL 950085, at *1 (S.D. Tex. Mar. 28, 2025). Marathon argued that proximity should be measured by pipeline distance (how far the gas would have to travel), while Koch argued that it should be measured as a straight-line distance ("as the crow flies"). *Id.* The court denied summary judgment on that issue. *Id.* at *6.

[31] *Atrium Med.*, 595 S.W.3d at 195 (quoting *Phillips*, 820 S.W.2d at 788); *see also FPL Energy*, 426 S.W.3d at 70.

damages here. Mercuria likewise has not conclusively proven actual damages, leaving a fact issue for trial.

¶16    The fundamental purpose of damages in a breach-of-contract case is to put the plaintiff in the economic position it would have been in if the contract had been performed.[32] Actual damages "compensate for a proven injury or loss."[33] This can be measured by expectation, reliance, and/or restitution damages.[34] Expectancy damages award a contract plaintiff the benefit of its bargain; reliance damages compensate the plaintiff for out-of-pocket expenses; and restitution damages restore to the plaintiff a benefit that it had conferred on the defendant.[35] These damages measures address the amount of actual damages suffered, a separate question from whether, under the parties' contract, such damages are recoverable.

---

[32] *See, e.g.*, *White Knight Dev., LLC v. Simmons*, 718 S.W.3d 203, 209 (Tex. 2025) ("Whether a plaintiff seeks legal damages or specific performance, the goal is to put the plaintiff back to the position it would have been in had there been no breach."); *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 419 n.20 (Tex. 2011) (quoting *Am. Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Corp.,* 798 S.W.2d 274, 278 (Tex.1990), for proposition that "[t]he basic measure of actual damages" for breach of contract or tortious interference with a contract is "to put the plaintiff in the same economic position he would have been in had the contract interfered with been actually performed").

[33] *In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 171–72 (Tex. 2013); *damages*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[34] *Atrium Med.*, 595 S.W.3d at 193.

[35] *Id.*

¶17    This is a contract for the sale of goods, generally governed by Texas's Uniform Commercial Code (the UCC).[36] Under the UCC, a buyer's actual damages for a seller's failure to deliver the goods may depend on whether the buyer "covers"—i.e., purchases substitute goods.[37] If the buyer covers, its damages are typically measured by [1] "the difference between the cost of cover and the contract price" [2] plus any recoverable incidental or consequential damages, [3] less expenses saved (such as the unpaid contract price).[38] If the buyer does not cover, its damages are typically measured by [1] "the difference between the market price at the time when the buyer learned of the breach and the contract price" [2] plus any recoverable incidental and consequential damages, [3] less expenses saved (such as the unpaid contract price).[39] The fundamental difference, then, is that a covering buyer's damages are measured by the difference between the cost of the cover gas

---

[36] Contracts for the purchase and sale of natural gas, once produced, are generally contracts for the sale of goods governed by the UCC. *See* TEX. BUS. & COM. CODE § 2.107(a); *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 569–71 (Tex. 1996); *Aquila Sw. Pipeline, Inc. v. Harmony Expl., Inc.*, 48 S.W.3d 225, 234 (Tex. App.—San Antonio 2001, pet. denied); *Fletcher v. Ricks Expl.*, 905 F.2d 890, 892 (5th Cir. 1990). The UCC applies when the gas sold is "to be severed by the seller," "but until severance a purported present sale thereof which is not effective as a transfer of an interest in land is effective only as a contract to sell." TEX. BUS. & COM. CODE § 2.107(a). Marathon has not raised any arguments relating to severance of the gas.

[37] TEX. BUS. & COM. CODE §§ 2.711–.712.

[38] *Id.* § 2.712(b).

[39] *Id.* § 2.713(a). In this scenario, the market price is determined at the place of tender, *id.* § 2.713(b).

and the contract price, while a non-covering buyer's damages are measured by the difference between the market price of the gas and the contract price.[40]

### a. Marathon's cost-basis measure of Mercuria's actual damages is not the correct standard here.

¶18    Marathon argues that Mercuria's actual damages are measured by the difference between what it originally paid for that stored gas plus any storage and transportation costs less what it would have paid for the undelivered gas under the contract.[41] Under this theory, the actual-damages formula would be: quantity x (cost basis – contract price). Since the parties stipulate a total cost basis $272,000 and the total contract price $354,960, these two amounts can be netted to determine Mercuria's actual damages under this theory. The calculation results in a negative number, such that Mercuria would have no actual damages:

| Marathon's Actual-Damages Theory | | |
|---|---|---|
| Total Cost Basis – Total Contract Price | | = Total |
| $272,000 – $354,960 | | = < $0 |

Marathon essentially implies that Mercuria economically *benefited* from Marathon's failure to deliver.

---

[40] *Id.* §§ 2.712(b), 2.713(a).

[41] Marathon's Resp. to Mercuria's Br. at 6 ("Mercuria's actual damages under an expectancy measure are the costs of its storage gas, plus fees, less what it would have paid Marathon for the same volume."); Stipulation at ¶ 3.

¶19    Marathon essentially seeks to treat Mercuria's stored gas as "cover," measuring Mercuria's actual damages as the difference between the contract price and what Mercuria paid for the storage gas. But Mercuria did not "cover"—i.e., it did not "*purchase*" substitute goods "*after* a breach."[42] Instead, Mercuria used gas it already owned and purchased well before the breach.[43]

¶20    This is important because actual damages are determined at the time of the breach, and Mercuria's stored gas was worth significantly more at the time of the breach than when it was purchased. Likewise, whether there is an "unbridgeable discrepancy" between the liquidated and actual damages is measured at the time of breach.[44] Marathon cannot use past gas prices in its actual-damages model when Mercuria's actual damages are measured at the time of breach, using the market price of gas at that time. And because Mercuria would purchase cover gas at or near the time of breach, the cost of the cover gas is likely to be similar to, or even the

---

[42] TEX. BUS. & COM. CODE § 2.712(a) (emphasis added).

[43] *Id*; *see also ATD Combusters, LLC v. Ameritube, LLC*, No. 618-CV-00077, 2019 WL 7759503, at *2 (W.D. Tex. Oct. 10, 2019) (holding that, under Section 2.712's definition of "cover," "a buyer must contract or purchase goods from a third party. A buyer cannot draw from its own inventory in substitution for the goods due from the seller." (citing *Chronister Oil Co. v. Unocal Ref. & Mkg.*, 34 F.3d 462 (7th Cir. 1994), for the holding that "an actual purchase or contract is required—taking similar goods from an existing inventory, without an actual purchase to replace them, is not 'cover'")); *but see Transoil (Jersey) Ltd. v. Belcher Oil Co.*, 950 F.2d 1115, 1121 (5th Cir. 1992) (allowing cover damages where party manufactured cover goods itself upon breach).

[44] *Atrium Med.*, 595 S.W.3d at 190; *FPL Energy*, 426 S.W.3d at 72.

same as, the market price at the time of breach, meaning actual damages under either the cover or non-cover standards would likely result in similar amounts.

¶21    Marathon's briefing does not argue that Mercuria had a duty to buy "cover" gas when Marathon failed to deliver instead of using its stored gas. Notably, under the NAESB form, the parties could have elected the Cover Standard, which would have required Mercuria to use "commercially reasonable efforts" to obtain replacement product at a reasonable price, and measures damages by the difference between the contract and the cover prices.[45] They did not. If Mercuria *had* covered, it would be in a very different situation than it is now because it would not have had to sacrifice 136,000 MMBtu in stored gas that was highly valuable at that time to replace the gas Marathon did not deliver. But Marathon would not necessarily have been better off: Mercuria could recover its cover costs, and there is no evidence that the price of cover gas would have been below market value.

¶22    Marathon's proposed actual-damages calculation suffers from three key defects: (1) it uses the cover approach to damages, when Mercuria did not pur-chase substitute goods after the breach; (2) it values the substitute gas at the time Mercuria purchased it rather than at the time of the alleged breach; and (3) it does not place Mercuria in (or even close to) the position Mercuria would have been in

---

[45] Base Contract § 3.2 ("Cover Standard" not selected by parties here).

16

had Marathon performed. Marathon's actual-damages calculation is thus incorrect as a matter of law.

### b. A market-price standard is generally consistent with governing legal standards for actual damages.

¶23   Because Mercuria did not cover, Mercuria's actual damages typically would be measured by the difference between the market price[46] at the time of breach and the contract price (plus incidental costs, less savings).[47] This measure of damages is consistent with the overarching goal of damages: to put Mercuria in the position it would have been if Marathon had performed under the contract.

¶24   Consider, for example, if the market value of natural gas had been $10/MMBtu at the relevant location on each of the relevant days:[48]

- If Marathon had performed, Mercuria would have kept its 136,000 MMBtu in stored gas worth $1,360,000 (136,000 x $10), received and used

---

[46] The market price and the spot price are distinct concepts, even if they are likely to be similar or the same amounts. The market price is the value of the gas for the purpose of calculating actual damages, and it may be measured by the spot market or another market, depending on the circumstances. The spot price is the value of the gas for the purpose of calculating liquidated damages per the parties' contract, and it is a defined term with a contract-specific meaning. Marathon argues that basing damages on market-value impermissibly collapses actual and liquidated damages. This argument fails for two reasons. First, it conflates the market price with the spot price. They may well be different amounts. Second, and more importantly, when these two amounts are similar or the same and result in similar or the same damages amounts, that does not indicate a problem; to the contrary, it indicates that the liquidated-damages provision is functioning exactly as intended by accurately estimating actual damages.

[47] TEX. BUS. & COM. CODE § 2.713(a). The Court ignores consequential damages, which Marathon argues are barred by the contract. Marathon's Br. at 14.

[48] For simplicity, this example ignores incidentals.

136,000 MMBtu from Marathon (net 0 MMBtu),[49] and paid Marathon $354,960, for a total of **$1,005,040** ($1,360,000 – $354,960).

- Consistently, measuring Mercuria's damages by the difference between the market price at the time of breach and the contract price would result in actual damages of **$1,005,040** ($1,360,000 –$354,960).

- Notably, if Mercuria instead purchased cover gas at market price (136,000 x $10 = $1,360,000), measuring Mercuria's damages by the difference between cover costs and the contract price would result in the same amount: **$1,005,040** ($1,360,000 – $354,960).[50]

- And if the spot price and market price were the same—a possibility but not a necessity—the spot-price damages would also be the same amount: 136,000 x ($10 – $2.61) = 136,000 x $7.39 = **$1,005, 040**.

In this hypothetical, the spot-price standard does exactly what a liquidated-damages provision is supposed to do: accurately estimate what the actual damages would be in an event of breach. And all three damages measures (cover, non-cover, and spot-price) do what they are supposed to do: put Mercuria in the position it would have been in if Marathon had performed under the contract.[51]

¶25    Marathon argues that allowing Mercuria to recover more than $26 million in damages, "even though it did not purchase any gas on the spot market to replace [the undelivered] gas" would be an impermissible "windfall." That is not

---

[49] This example does not add any amount for profits Mercuria could have made on its use of the gas delivered by Marathon.

[50] *Cf. Equitable Res. Mktg. Co. v. U.S. Gas Transp., Inc.*, No. 05-99-00619-CV, 2001 WL 533808, at *8 (Tex. App.—Dallas May 21, 2001, no pet.) (observing that, because the buyer purchased cover gas at market price, there was no difference between the damages measures in 2.712 and 2.713).

[51] This, of course, assumes that Marathon was obligated to deliver under the contract. To the extent Marathon's delivery was excused by force majeure, Mercuria is not entitled to damages.

necessarily the case. If the market price and value of the gas was $26 million, whether Mercuria bought $26 million worth of new gas or gave up $26 million worth of gas it already owned, Marathon's breach would have deprived Mercuria of $26 million in assets (whether funds or stored gas).

### c. Mercuria has not conclusively proven its actual damages.

¶26    Mercuria agrees that its actual damages should be measured by "the difference between the market price and the contract price at the time of the breach,"[52] but it calculates the market value of the gas using the same formula it uses to calculate the spot price, such that its proposed actual and spot-price damages are identical:[53] $26,541,803.20.[54] The Court holds that Mercuria has not conclusively proven that this is the correct amount of its actual damages, as several issues remain outstanding.

¶27    First, Mercuria agrees that the UCC governs its actual damages[55] but has not yet shown that its damages model conforms to the UCC's standards for proving market value. In the event of failure to deliver, market price "is to be determined

---

[52] Mercuria's Br. at 9–10.

[53] *See* Marathon's Br. at Exhibit 7 (Mercuria's Fifth Supplemental Initial Disclosures) & Exhibit 8 (Mercuria's Responses and Objections to Marathon's Sixth Set of Requests for Production and Fifth Set of Interrogatories).

[54] *See* "Mercuria's Spot-Price Calculation" Table, *supra.*

[55] Mercuria's Resp. to Marathon's Br. at 5, 11.

as of the place for tender" and "at the time when the buyer learned of the breach."[56] If evidence of the market price at that time and place "is not readily available," a party can rely on evidence of the market price "within any reasonable time before or after the time described or at any other place which in commercial judgment or under usage of trade would serve as a reasonable substitute," subject to "any proper allowance for the cost of transporting the goods to or from such other place."[57] Mercuria has not yet shown whether or how its spot-price calculation complies with those standards, or if it does not, why that is appropriate here.

¶28    Second, as discussed above, Mercuria has not shown that the variables it used to calculate the spot price are the correct variables. Thus, even assuming the market price for actual damages should be calculated using the same variables as those required by the contract to calculate the spot price, those variables have not been established as a matter of law at this time.

### d. Market value does not necessarily equate to lost profits.

¶29    Marathon equates the market value of gas with lost profits Mercuria would have obtained from selling its stored gas and argues that they are thus consequential damages barred by Section 13 of the contract.[58] The Court disagrees that

---

[56] *See* TEX. BUS. & COM. CODE § 2.713(a), (b).

[57] *Id.* § 2.723(b).

[58] Marathon's Br. at 14 ("Section 13 of the Base Contract forbids Mercuria's recovery of the 'market value' of that gas because it states that 'neither party shall be liable for consequential, non-

market value necessarily equates to lost profits.[59] A party might rely on evidence of market value to show the price that would have been paid in a lost sale[60] or evidence of lost profits to show the market value of something.[61] But does not make market value and lost profits interchangeable. Mercuria's lost profits on a hypothetical sale of the gas may or may not be the same as the gas's market value.[62] And even if Mercuria sold the gas at market value, the entire amount would not be profits; Mercuria would need to reduce that amount by its cost basis for obtaining the gas as well all of the costs incurred incident to the sale.[63]

---

incidental, punitive, exemplary or indirect damages, lost profits, or other business interruption damages[.]' In other words, Marathon is not liable for Mercuria's lost profits as a result of it being unable to sell Marathon's gas for 'market value.'"). Marathon's Resp. at 7 ("Mercuria's theory converts actual damages into market value damages, which is forbidden by the text of Section 13.").

[59] For example, the Texas Supreme Court has observed that "an increase in the market value of goods never delivered under a contract is not the same as lost profits." *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002) (holding that contract damages are measured at the time of breach, not the time of trial).

[60] *See, e.g.*, *Am. Midstream (Ala. Intrastate), LLC v. Rainbow Energy Mktg. Corp.*, 714 S.W.3d 572, 584 (Tex. 2025) ("The parties do not dispute that the lost-profits damages were based on accurate market prices.").

[61] *Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 278 (Tex. 2015) ("Fair market value is generally determined either by using comparable market sales, calculating replacement cost less depreciation, or capitalizing net income—that is, profits.").

[62] *See, e.g.*, *Transoil (Jersey) Ltd. v. Belcher Oil Co.*, 950 F.2d 1115, 1121 (5th Cir. 1992) (recognizing that "[i]n some situations, the resale price may accurately reflect the value of the goods on the date of delivery," but holding that was not so under the facts of that case).

[63] *Bowen v. Robinson*, 227 S.W.3d 86, 96 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) ("Lost profits are damages for the loss of net income to a business and, broadly speaking, reflect income from lost business activity, less expenses that would have been attributable to that activity."); *Texaco, Inc. v. Phan*, 137 S.W.3d 763, 771 (Tex. App.—Houston [1st Dist.] 2004, no pet.) ("Lost profits must be based on net profits, not gross revenues.").

¶30   Importantly, when a sales contract does not bar consequential damages, a buyer may recover consequential damages *in addition to* the difference between the contract price and market price (or for a covering buyer, the difference between the contract price and the cost of cover).[64] If Mercuria sought to recover both the market value of its stored gas (or Marathon's undelivered gas) *plus* the lost profits it would have made on the sale of that gas, that could be a "windfall" and an impermissible double recovery.[65] But here, Mercuria's damages model only seeks to recover this value (or what it contends this value is) once, whether as the market or spot price, and does not seek to recover lost profits on any potential sale of such gas.

**Conclusion**

¶31   The arguments and evidence necessary to ascertain the amount of Mercuria's actual and spot-price damages have not yet been put before the Court. Without this, the Court cannot determine whether there is an "unbridgeable gap"

---

[64] TEX. BUS. & COM. CODE §§ 2.712(b), 2.713(a). Under the UCC, consequential damages include, among other things, "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." *Id.* § 2.715(b)(1). Comment six to section 2.715 specifies that "[i]n the case of sale of wares to one in the business of reselling them, resale is one of the requirements of which the seller has reason to know." *Id.* cmt. 6; *see also Amerada Hess Corp. v. Schwartz*, No. 14-93-01057-CV, 1995 WL 472341, at *4 (Tex. App.—Houston [14th Dist.] Aug. 10, 1995, no writ) (upholding award of lost profits on resale of pipe under UCC).

[65] For example, in real-property cases, a party may be able to recover lost profits in addition to the market value if the market value is cost based but cannot recover lost profits in addition to market value if the market value already takes into account any potential revenue stream from the property. *Compare City of San Antonio v. El Dorado Amusement Co., Inc.*, 195 S.W.3d 238, 247 (Tex. App.—San Antonio 2006, pet. denied), *with State v. Whataburger, Inc.*, 60 S.W.3d 256, 263 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

between the two that makes Section 3.2 an unenforceable penalty as applied here. The Court has determined, however, that Marathon's cost-basis measure of actual damages is not the correct legal standard under the facts of this case.

Date signed: October 28, 2025

_____
Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division, *sitting by assignment
in the Eleventh Division*

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 107385281
Filing Code Description: No Fee Documents
Filing Description: Memorandum Opinion & Order
Status as of 10/28/2025 2:56 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Timothy C.Shelby | | tshelby@azalaw.com | 10/28/2025 2:28:37 PM | SENT |
| David T. McDowell | | david.mcdowell@mhllp.com | 10/28/2025 2:28:37 PM | SENT |
| Mark Trachtenberg | | mark.trachtenberg@haynesboone.com | 10/28/2025 2:28:37 PM | SENT |
| Sammy Ford | | sford@azalaw.com | 10/28/2025 2:28:37 PM | SENT |
| Valerie Koinis | | vkoinis@azalaw.com | 10/28/2025 2:28:37 PM | SENT |
| Ryan Pitts | | ryan.pitts@haynesboone.com | 10/28/2025 2:28:37 PM | SENT |
| Alejandra Ramos | | aramos@azalaw.com | 10/28/2025 2:28:37 PM | SENT |
| Garrett Martin | | garrett.martin@haynesboone.com | 10/28/2025 2:28:37 PM | SENT |
| Paul Galante | | PGalante@azalaw.com | 10/28/2025 2:28:37 PM | SENT |
| Emily Adler | | eadler@azalaw.com | 10/28/2025 2:28:37 PM | SENT |
| Rachel HBartenfeld | | rachel.bartenfeld@haynesboone.com | 10/28/2025 2:28:37 PM | SENT |
| AZA Service Email Address | | service@azalaw.com | 10/28/2025 2:28:37 PM | SENT |
| Ab Henry | | ahenry@azalaw.com | 10/28/2025 2:28:37 PM | SENT |
| William B.Thomas | | william.thomas@mhllp.com | 10/28/2025 2:28:37 PM | SENT |
| Mary E.Green | | mary.green@mhllp.com | 10/28/2025 2:28:37 PM | SENT |
| William King | | william.king@mhllp.com | 10/28/2025 2:28:37 PM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 10/28/2025 2:28:37 PM | SENT |
| Richard Hood | | richard.hood@mhllp.com | 10/28/2025 2:28:37 PM | SENT |
| Matthew Norman | | matthew.norman@mhllp.com | 10/28/2025 2:28:37 PM | SENT |